IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02847-REB-CBS

N.E.L. and
M.M.A.,

       Plaintiffs,

v.

DOUGLAS COUNTY, COLORADO;
MONICA GILDNER, in her individual capacity;
ANGELA WEBB, in her individual capacity;
TINA ABNEY, in her individual capacity;
LESA ADAME, in her individual capacity; and
CARL GARZA, in his individual capacity.

       Defendants.

---

## RECOMMENDATION ON PENDING MOTIONS TO DISMISS

---

Magistrate Judge Craig B. Shaffer

      This matter comes before the court on the Motion to Dismiss Amended Complaint (doc. # 57) filed by Defendants Lesa Adame, Carl Garza, and Douglas County (hereinafter referred to collectively as the "Douglas County Defendants"), and the Motion to Dismiss First Amended Complaint with Memorandum in Support or, in the alternative, Motion for Summary Judgment (doc. # 65) filed by Defendants Monica Gildner, Angela Webb, and Tina Abney (hereinafter referred to collectively as the "Kansas Defendants"). These motions have been fully briefed by the parties.

      On March 1, 2016, this matter was referred to the Magistrate Judge to, *inter alia*, "hear and make recommendations on dispositive matters that have been referred."  By separate

1

memoranda, both of the pending motions have been referred to this court for recommendation.  I have carefully reviewed the motions, all related briefing and attached exhibits, the entire court file, and the applicable case law.

## PROCEDURAL HISTORY

This action was commenced with the filing of the original Complaint on December 1, 2015.  The First Amended Complaint (doc. #55), filed on April 29, 2016, asserts six claims for relief.  The First Claim asserts a Fourth Amendment violation and contends that all Defendants "approved and/or conducted an unlawful seizure . . . by which Plaintiffs were deprived of their liberty without due process when they were prohibited . . . from any movement or travel with their mother, father and grandparents."  The Second Claim is brought against Defendants Gildner, Webb and Abney and asserts that Plaintiffs' Fourth Amendment rights were violated when they were "held against their will for five days prior to a hearing on the CINC petitions."  The Third Claim is brought against Defendants Gildner, Webb, Abney, Adame, and Garza and asserts a violation of Plaintiffs' Fourteenth Amendment right to maintain a familial relationship with their parents, siblings, and grandparents.  The Fourth Claim alleges that Defendants Gildner, Abney, Webb, Adame and Garza conspired to deprive Plaintiffs of their constitutional rights.  The Fifth Claim contends that Plaintiffs are entitled to exemplary damages because "[t]he actions of Gildner, Abney, Webb, Adame and Garza were attended by retaliation, malice, ill will, intent and/or recklessness, [and] callous disregard of Plaintiffs' rights, or indifference to Plaintiffs' rights."  Finally, the Sixth Claim alleges that Defendant Douglas County violated Plaintiffs' Fourth Amendment rights by adopting an unlawful policy that authorized county sheriff's personnel "to seize Plaintiffs based on an out-of-state *ex parte* order in violation of the

United States Constitution and Colorado law," or through deliberate indifference by failing to "adopt a policy requiring . . . or in failing to train personnel . . . to comply with the United States Constitution and Colorado law."

As the parties are well-familiar with the underlying circumstances of this case, I will only briefly summarize those facts and circumstances that are necessary to place the pending motions and this Recommendation in context.

It appears that Mr. and Mrs. Doe had their first contact with the Kansas Department of Social and Rehabilitation Services[1] in June 2008 after one of the Doe children[2] began exhibiting troubling behavior and making troubling comments that allegedly stemmed from improper interaction with that child by one of Mrs. Doe's relatives.  *See* First Amended Complaint at ¶¶ 17 and 21.  Later, other Doe children reported having suffered abuse from the same suspected relative.  *Id.* at ¶¶ 38, 65 and 77.  During the time period relevant to this case, the Kansas Defendants were employed by SRS/DCF.  The Kansas Defendants' contacts with the Doe family continued into 2009 and eventually became contentious.  As some point, Mr. Doe apparently "communicated to [Ms.] Webb and [Ms.] Abney that he did not wish to have further contact with [Ms.] Gildner due to the animosity created by her antagonistic, biased and baseless positions." *Id.* at ¶ 55.  In February 2009, Mr. Doe "filed a formal complaint with SRS/DCF" against Ms. Gildner.  *Id.* at ¶ 66.  The actual cause of this deteriorating situation is a matter of some dispute

---

[1]This state agency is now called the Kansas Department of Children and Families, and is referenced in the First Amended Complaint as "SRS/DCF."  *See* First Amended Complaint, at ¶5.

[2]The Plaintiffs in this action, N.E.L. and M.M.A., are two of the Does' ten children. Although Plaintiffs have reached the age of majority, during the relevant time period, both were minors.

and wholly irrelevant to the disposition of the pending motions.

On or about April 20, 2009, ten Child-in-Need of Care (CINC) petitions were filed in the District Court for Johnson County, Kansas by the District Attorney's Office. Those petitions "requested termination of Mr. and Mrs. Doe's parental rights, appointment of a permanent custodian for Plaintiffs and their siblings, temporary removal of Plaintiffs and their siblings from their Parents' custody, and an order of child support." *Id.* at ¶ 86. The Johnson County District Court set a non-emergency hearing on these petitions for May 11, 2009. On May 5, 2009, SRS/DCF sought *Ex Parte* Orders of Protective Custody in the District Court of Johnson County. Although Mr. and Mrs. Doe dispute the information proffered in support of the petitions for those orders, the District Court entered *Ex Parte* Orders on May 5, 2009.

On that same day, Mrs. Doe and her children were visiting long-standing family friends, Dr. and Mrs. G, who were living in unincorporated Douglas County, Colorado. At some point, Defendants Adame and Garza were made aware of the *Ex Parte* Orders issued by the Johnson County District Court and they went to the G's residence.[3] After some discussion on May 6, 2009, Mrs. Doe left the G residence. Later that same day, Dr. G and his wife drove the Doe children back to Kansas where they were placed in the temporary custody of SRS/DCF.

In moving to dismiss the First Amended Complaint, the Douglas County Defendants contend that Plaintiffs' claims are barred by the applicable statute of limitations, as well as the doctrines of absolute and qualified immunity. The Douglas County Defendants further insist that

---

[3]On May 6, 2009, Ms. Adame was a social worker either employed by the Colorado Department of Social Services or the Douglas County Department of Human Services, and Mr. Garza was employed by the Douglas County Sheriff's Office. *See* First Amended Complaint, at ¶¶ 10 and 11.

the First Amended Complaint fails to state a viable claim for relief against Douglas County.  The

Kansas Defendants have moved to dismiss the claims against them based upon a lack of personal

jurisdiction.  In the alternative, the Kansas Defendants insist that Plaintiffs' claims are barred by

the statute of limitations and the doctrines of absolute or qualified immunity, and that Plaintiffs'

alleged Fourth Amendment violation fails to state a cognizable claim for relief.  Plaintiffs

naturally take strong exception to all of these arguments.

## ANALYSIS

I.      *The Douglas County Defendants' Motion*

        Rule 12(b)(6) states that a court may dismiss a complaint for "failure to state a claim

upon which relief can be granted."  *See* Fed. R. Civ. P. 12(b)(6).  In deciding a motion under

Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view

these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d

1120, 1124-25 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir.

2009)).  However, a plaintiff may not rely on mere labels or conclusions "and a formulaic

recitation of the elements of a cause of action will not do."  *See Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555 (2007).  Rather, the court's analysis is two-fold.

> First, the court identifies "the allegations in the complaint that are not entitled to
> the assumption of truth," that is those allegations that are legal conclusions, bare
> assertions, or merely conclusory.  Second, the court considers the factual
> allegations "to determine if they plausibly suggest an entitlement to relief."  If the
> allegations state a plausible claim for relief, such claim survives the motion to
> dismiss.  Notwithstanding, the court need not accept conclusory allegations
> without supporting factual averments.

*Wood v. Wells Fargo Bank, N.A.*, No. 13-cv-01731-CMA-KMT, 2013 WL 5763101, at *2 (D.

Colo. Oct. 23, 2013) (internal citations omitted).

As the Tenth Circuit explained in *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d

1174, 1177 (10th Cir. 2007),

> the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts
> in support of the pleaded claims is insufficient; the complaint must give the court
> reason to believe that *this* plaintiff has a reasonable likelihood of mustering
> factual support for *these* claims.

"The burden is on the plaintiff to frame 'a complaint with enough factual matter (taken as true)

to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th

Cir. 2008) (quoting *Bell Atl. Corp*., 555 U.S. at 556). The ultimate duty of the court is to

"determine whether the complaint sufficiently alleges facts supporting all the elements necessary

to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v.

Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

Plaintiffs attached to the First Amended Complaint a redacted *Ex Parte* Order of

Protective Custody, dated May 5, 2009 (Exhibit 1) (doc. #55-1) and a redacted document entitled

Colorado Department of Social Services, Douglas County Department of Human Services Safety

Plan, dated May 6, 2009 (Exhibit 2) (doc. #55-2). The parties also have attached exhibits to their

briefs in support of or in opposition to the Douglas County Defendants' motion to dismiss.

Those exhibits consist of judicial records from Colorado's Eighteenth Judicial District

(Defendants' Exhibit A, doc. # 57-1 and Plaintiffs' Exhibit 3, doc. #67-3) and the District Court

for Johnson County, Kansas (Plaintiffs' Exhibit 2, doc. #67-2 and Plaintiffs' Exhibit 4, doc. #67-

4). The parties also included as exhibits excerpts from the Colorado Code of Regulations, 12

CCR 2509-2 (Defendants' Exhibit B, doc. #57-2 and Exhibit C, doc. #76-1).[4]

---

[4]The Kansas Defendants and Plaintiffs also attached exhibits to their briefs in support of
or in opposition to the Kansas Defendants' motion to dismiss. Most of those exhibits are

Generally, a court considers only the contents of the complaint when ruling on a Rule 12(b)(6) motion. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Exceptions to this general rule include: documents incorporated by reference in the complaint; documents referred to in and central to the complaint, when no party disputes their authenticity; and "matters of which a court may take judicial notice." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). *Cf. Gilbert v. Bank of Am. Corp.*, No. 11-cv-00272-BLW, 2012 WL 4470897, at *2 (D. Idaho Sept. 26, 2012) (noting that a court may take judicial notice "of the records of state agencies and other undisputed matters of public record" without transforming a motion to dismiss into a motion for summary judgment). *Cf. Catchai v. Fort Morgan Times*, No. 15-cv-00678-MJW, 2015 WL 6689484, at *4 (D. Colo. Nov. 3, 2015) (in ruling on the pending motion to dismiss, the court acknowledged its ability to take judicial notice of court records from Morgan County District Court); *Reyes v. Hickenlooper*, 84 F. Supp. 3d 1204, 1207 (D. Colo. 2015) (noting that the court could take judicial notice of court filings from other cases without converting a Rule 12(b)(6) motion into a summary judgment motion). While the court has read and considered the parties' exhibits, I will analyze the issues and arguments under the standard governing motions to dismiss under Rule 12(b)(6).

A.   <u>Defendants' Claim to Absolute Immunity</u>

Defendants Adame and Garza contend that all claims against them must be dismissed based on the doctrine of absolute or quasi-judicial immunity because on May 6, 2009 they were simply executing orders issued by a Kansas court. Plaintiffs argue in response that "absolute immunity does not apply because the Kansas *Ex Parte* Orders were not facially valid" and

---

judicial records subject to judicial notice by this court.

because "Adame and Garza exceeded the scope of the orders." *See* Response to Douglas Defendants' Motion to Dismiss, at 12.

The Tenth Circuit has held that "enforcing a court order or judgment is intrinsically associated with a judicial proceeding" and that "[a]bsolute immunity for officials assigned to carry out a judge's orders is necessary to insure that such officials can perform their function without the need to secure permanent legal counsel." *Valdez v. City & Cty. of Denver*, 878 F.2d 1285, 1289 (10th Cir. 1989) ("it is simply unfair to spare the judges who give orders while punishing the officers who obey them"). *See also Moss v. Kopp*, 559 F.3d 1155, 1163-1168 (10th Cir. 2009) (holding that "[j]ust as judges acting in their judicial capacity are absolutely immune from liability under section 1983, 'official[s] charged with the duty of executing a facially valid court order enjoy [ ] absolute immunity from liability for damages in a suit challenging conduct prescribed by that order") (quoting *Turney v. O'Toole*, 898 F.2d 1470, 1472 (10th Cir. 1990). "The 'fearless and unhesitating execution of court orders is essential if the court's authority and ability to function are to remain uncompromised.'" *Coverdell v. Dep't of Soc. & Health Servs.*, 834 F.2d 758, 765 (9th Cir. 1987). *Cf. Smeal v. Alexander*, No. 5:06 CV 2109, 2006 WL 3469637, at *6 (N.D. Ohio Nov. 30, 2006) ("quasi-judicial immunity extends to those persons performing tasks so integral or intertwined with the judicial process that they are considered an arm of the judicial officer who is absolutely immune").

"[F]or the defendant state official to be entitled to quasi-judicial immunity, the judge issuing the disputed order must be immune from liability in his or her own right, the officials executing the order must act within the scope of their own jurisdiction, and the officials must only act as prescribed by the order in question." *Moss*, 559 F.3d at 1163. The doctrine of quasi-

judicial immunity further requires that the court order in question be "facially valid." *Id.* at

1164. The Tenth Circuit has recognized, however, that a court order may be "facially valid"

even if that order is infirm or erroneous as a matter of state law.

> "State officials 'must not be required to act as pseudo-appellate courts
> scrutinizing the orders of judges,' but subjecting them to liability for executing an
> order because the order did not measure up to statutory standards would have just
> that effect." Further, "[t]o allow plaintiffs to bring suit any time a state agent
> executes a judicial order that does not fulfill every legal requirement would make
> the agent 'a lightning rod for harassing litigation aimed at judicial orders.'"
> "Simple fairness requires that state officers 'not be called upon to answer for the
> legality of decisions which they are powerless to control.'"

*Id.* at 1165 (internal citations omitted).

Plaintiffs contend that the First Amended Complaint "alleges specifically that the [*Ex

Parte* Orders] were facially <u>invalid</u> by being issued from a Kansas court and being incomplete,

such that Adame and Garza could see for themselves that no one from 'Kansas State Social

Services' was granted custody by the [*Ex Parte* Orders]." *See* Plaintiffs' Response to Douglas

Defendants' Motion to Dismiss, at 14 (emphasis in original). Plaintiffs also argue a Kansas

judge "had no jurisdiction to issue *ex parte* orders for execution <u>in Colorado</u>." *Id.* at 15

(emphasis in original).

The *Ex Parte* Orders in question purportedly were issued "pursuant to K.S.A. 38-2242"[5]

---

[5]This statute provides that a court "upon verified application, may issue ex parte an order
directing that a child be held in protective custody and, if the child has not been taken into
custody, an order directing that child be taken into custody." A court may issue such an ex parte
order "only after the court has determined there is probable cause to believe the allegations in the
application are true." "If the court issues an order of protective custody, the court may also enter
an order restraining any alleged perpetrator of physical, sexual, mental or emotional abuse of the
child from residing in the child's home; visiting, contacting, harassing or intimidating the child,
other family member or witness; or attempting to visit, contact, harass or intimidate the child,
other family member or witness."

and specifically state that the District Court of Johnson County, Kansas found, in part, that "[r]easonable efforts are not required to maintain the child in the home because an emergency exists which threatens the safety of the child," that "remaining in the home or returning home would be contrary to the welfare of the child," and that "immediate placement is in the best interest of the child." *See* Exhibit 1 (doc. #55-1) attached to First Amended Complaint. The Orders further noted allegations of "physical, sexual, mental or emotional abuse." These documents bear the caption "*EX PARTE* ORDER OF PROTECTIVE CUSTODY and the signature of "Kathleen L. Sloan, Judge of the District Court," and apparently ere time-stamped by the Clerk of the District Court on "2009 May -5 PM 3:40." Although these court filings set forth "findings" of fact, Judge Sloan did not direct any action to be taken based upon those findings. So, for example, the *Ex Parte* Order did not explicitly require that the identified child be taken into custody. The district judge also did not check the box that "FURTHER ORDERED that any duly authorized law enforcement officer of the jurisdiction where the child(ren) can be found shall take the child(ren) named above into custody and deliver the child(ren) to" a specified location or government official. Judge Sloan also did not indicate that a "restraining order shall be filed against" anyone." In short, from the face of the *Ex Parte* Order, it is difficult to discern exactly what actions Judge Sloan required or even contemplated.

As this matter comes before the court on a motion to dismiss, I must confine my analysis to the well-pled facts (but not conclusory allegations) contained in the First Amended Complaint and the exhibits properly before the court. The court is required to construe those facts and documents in a light most favorable to Plaintiffs.

The First Amended Complaint contends that the *Ex Parte* Orders issued by Judge Sloan

were not based upon probable cause and falsely presented or omitted material facts concerning

Mr. and Mrs. Doe and their children.  There are no well-pled facts in the First Amended

Complaint that would suggest Defendants Adame or Garza were aware of these alleged

deficiencies in the *Ex Parte* Orders.  *But see Moss*, 559 F.3d at 1165 ("Simple fairness requires

that state officers 'not be called upon to answer for the legality of decisions which they are

powerless to control.'").

However, there is a fundamental problem with the Douglas County Defendants'

invocation of quasi-judicial immunity.  As the Tenth Circuit has explained, "an official charged

with the duty of executing a facially valid court order enjoys absolute immunity from liability for

damages in a suit *challenging conduct prescribed by that order*."  *Valdez*, 878 F.2d at 1286

(emphasis added).  Stated differently the government official is entitled to quasi-judicial

immunity because he or she is taking actions commanded by the court orders in question.  *Cf.*

*Martin v. Bd. of Cty. Comm'rs,* 909 F.2d 402, 405 (10th Cir. 1990) (holding that quasi-judicial

immunity protects defendants from damage claims directed to the conduct prescribed in the court

order itself, but not to the manner of its execution).  Here, Judge Sloan's *Ex Parte* Orders simply

make findings of fact; nothing is specifically or inferentially "ordered."[6]  Therefore, the rationale

_____

[6]At some point, Judge Sloan apparently realized that her *Ex Parte* Orders did not mandate any specific action.  Exhibits attached to the Kansas Defendants' motion to dismiss include two documents captioned "Pick Up Order," dated May 5, 2009 and time stamped 3:40 PM.  These Orders state that "on the 5TH DAY OF MAY, 2009, [each Plaintiff] was placed in the care, custody and control of [the State of Kansas] with authority for suitable placement" and direct "ANY LAW ENFORCEMENT AGENCY" to take said child into your custody and transport said child to court approve Juvenile Intake and Assessment Center."  *See* Exhibits I and J (doc. ## 64-9 and 64-10) attached to Motion to Dismiss.  Another exhibit proffered by the Kansas Defendants consists of a "Journal Entry Nunc Pro Tunc" filed in the District Court of Johnson County on May 8, 2009 purporting to "correct[ ] the Ex Parte Orders of Custody filed on May 5, 2009 . . . to read as follows: THE COURT HEREBY ORDERS THAT the above named children

for quasi-judicial immunity seems to be lacking in this case.  I recommend that the motion to dismiss be denied to the extent Defendants Adame and Garza are relying in whole or in part on the doctrine of absolute or quasi-judicial immunity.

      B.      <u>Defendants' Claim to Qualified Immunity</u>

Even if Defendants Adame and Garza are not protected by quasi-judicial immunity, they are entitled to qualified immunity for conduct performed within the scope of their official duties. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 565 U.S. 535, 132 S. Ct. 1235, 1244 (2012) (internal quotation marks and citations omitted). *See also Duncan v. Gunter*, 15 F.3d 989, 992 (10th Cir. 1994) (same).  Stated differently, the affirmative defense of qualified immunity "protects all but the plainly incompetent [government official] or those who knowingly violate the law." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001).  Whether Defendants Adame and Garza are entitled to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).

In resolving a motion to dismiss based on qualified immunity, the first prong of the court's analysis asks "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  This determination turns

---

shall be placed in the custody of: The Secretary of Social and Rehabilitation Services." *See* Exhibit K (doc. # 64-11), attached to Motion to Dismiss.  The foregoing orders are not referenced in the First Amended Complaint, and it is not clear whether Defendants Adame and Garza ever received the foregoing court filings prior to arriving at the G's residence on May 6, 2009.  But again, on a motion to dismiss the court must construe the allegations in a light most favorable to Plaintiffs.

on the substantive law regarding the constitutional right at issue.  *See McGettigan v. Di Mare*, 173 F. Supp. 3d 1114, 1121 (D. Colo. 2016) (citing *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1282-83 (10th Cir. 2007)).

Under the second prong of the qualified immunity doctrine, the plaintiff must show that the right at issue was "clearly established" at the time of the defendant's alleged violation.[7] *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  "The clearly established inquiry examines whether the contours of the constitutional right were so well-settled, in the particular circumstances presented, that every reasonable . . . official would have understood that what he is doing violates that right."  *Lane v. Yohn*, No. 12-cv-02183-MSK-MEH, 2013 WL 4781617, at *3 (D. Colo. Sept. 6, 2013) (internal quotation marks and citation omitted), *appeal dismissed*, No. 13-1392 (10th Cir. Oct. 31, 2013).  "[T]he salient question . . . is whether the state of the law at the time of [the] incident provided 'fair warning'" to Defendants Adame and Garca that their alleged conduct was unconstitutional. *Tolan v. Cotton,* __ U.S. __, 134 S. Ct. 1861, 1866 (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  "To satisfy this prong, the burden is on the plaintiff to point to Supreme Court or Tenth Circuit precedent (or the clear weight of other circuit courts) that recognizes an actionable constitutional violation in the circumstances presented."  *Havens v. Johnson*, No. 09-cv-01380-MSK-MEH, 2014 WL 803304, at *7 (D. Colo. Feb. 28, 2014) (citing *Schwartz v. Booker*, 702

---

[7]The court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009).  However, "[q]ualified immunity is applicable unless" the plaintiff can satisfy both prongs of the inquiry. *Id.*

F.3d 573, 587-88 (10th Cir. 2012)), *aff'd,* 783 F.3d 776 (10th Cir. 2015).  "It is not necessary for the plaintiff to adduce a case with identical facts, but the plaintiff must identify some authority that considers the issue not as a broad general proposition, but in a particularized sense . . . ." *Havens,* 2014 WL 803304, at *7.  There must be "a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Duncan v. Gunter*, 15 F.3d 989, 992 (10th Cir. 1994) (internal quotation marks and citations omitted).

In the past, the Tenth Circuit has employed a "sliding scale" in applying the second prong of the qualified immunity doctrine:  "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Casey*, 509 F.3d at 1284 (quoting *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004)).  "As long as the unlawfulness of the [defendant's] actions was 'apparent' 'in light of pre-existing law,' then qualified immunity is inappropriate." *Estate of Booker v. Gomez*, 745 F.3d 405, 433-34 (10th Cir. 2014) (quoting *Hope*, 536 U.S. at 739).

The Supreme Court recently shed additional light on how the second prong of the qualified immunity doctrine should be applied in the context of a Fourth Amendment claim.  In vacating the decision of a divided panel of the Tenth Circuit, the Supreme Court in *White v. Pauly,* 580 U.S. __, 2017 WL 69170, at *4 (Jan. 9, 2017), reiterated that clearly established law "should not be defined 'at a high level of generality'" and "must be 'particularized' to the facts of the case."  Otherwise, "'[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'"  *Id.*  The lower court in *White* "failed to identify a case where an officer acting under

14

similar circumstances as [the defendant] was held to have violated the Fourth Amendment." *Id.* at *5. The Supreme Court's *per curiam* opinion emphasized that *White* "present[ed] a unique set of facts and circumstances" and that "alone should have been an important indication to [lower courts] that [the defendant] did not violate a 'clearly established' right." *Id.*

### 1. *Plaintiffs' First Claim Alleging A Fourth Amendment Violation*

Plaintiffs' First Claim asserts that Defendants Adame and Garza violated their Fourth Amendment right to be free from unlawful seizure.

A violation of the Fourth Amendment requires an intentional acquisition of physical control. *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989). A seizure for purposes of the Fourth Amendment occurs when "government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *JL v. N.M. Dep't of Health*, 165 F. Supp. 3d 996, 1042 (D. N.M. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n. 10 (1989)).

> [A] person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatsoever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the policy and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." * * * We conclude that a person has been "seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980) (internal citations omitted). *Cf.*

*United States v. Beamon*, 576 F. App'x 753, 757 (10th Cir. 2014) ("until a citizen's liberty is

actually restrained, there is no seizure" for purposes of the Fourth Amendment).

Every "seizure," however, does not necessarily equate to a constitutional violation,

because the Fourth Amendment only prohibits "unreasonable" seizures. *See JL*, 165 F. Supp. 3d

at 1043. *Cf. Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994) (to state a violation of the

Fourth Amendment, a plaintiff must allege both that a defendant's conduct constituted a seizure

and that the seizure was unreasonable). The Fourth Amendment's "central requirement" is one

of reasonableness. *See Brower*, 489 U.S. at 599 (emphasizing that a seizure "alone is not enough

for § 1983 liability; the seizure must be unreasonable") (internal quotation marks omitted).

"[C]ourts have long recognized that the reasonableness of a seizure depends not just on why or

when it is made, but also on how it is accomplished." *Fisher v. City of Las Cruces*, 584 F.3d

888, 894 (10th Cir. 2009) (citation omitted). "[T]o determine whether a seizure is reasonable,

which is the Fourth Amendment's 'ultimate standard,' a court must balance the government's

interest in conducting the seizure against the individual's interest in being free from arbitrary

governmental interference." *JL*, 165 F. Supp. 3d at 1043 (internal citations omitted).

The First Amended Complaint alleges the following pertinent facts which, for purposes

of the pending motion, the court will presume are true and construe in a light most favorable to

Plaintiffs. On May 6, 2009, Mrs. Doe and all of her children were visiting Dr. and Mrs. G at

their home in Douglas County, Colorado. *See* First Amended Complaint at ¶ 123. On that same

day, Defendants Adame and Garza, "at the instigation of the Kansas SRS/DCF, Gildner, Abney

and Webb," went to the home of Dr. and Mrs. G "to carry out official business on behalf of the

Douglas County Sheriff's Office, the Department of Human Services for Douglas County, and

the Colorado Department of Social Services." *Id.* at ¶ 125. Either Defendant Adame or

16

Defendant Garza told Dr. G that "they were in possession of a court order from the State of Kansas to seize custody of all ten of the Doe's children and demanded entry and custody of the children."[8] *Id.* at ¶ 132. Defendant Adame also "represented to Dr. G that she had been contacted by the Kansas SRS/DCF." *Id.* at ¶ 133. On the advice of an "attorney-friend [on the] telephone, Dr. G asked Defendants if they had a warrant or an order issued by a Colorado court. *Id.* at ¶ 135. Defendants allegedly responded that they were not required to have a warrant to enter the residence and "that they 'do this all the time.'" *Id.* at ¶¶ 136-137. Plaintiffs allege that at some point during this exchange, Defendant Garza "became belligerent, raised his voice and threatened Dr. G with arrest or contempt for interfering with law enforcement." *Id.* at ¶ 138. Deputy Garza allegedly also stated that he and Defendant Adame were "coming in and we're taking these kids." *Id.* at ¶ 139. Throughout the incident, Defendant Garza was wearing a sidearm. *Id.* at ¶ 130. Plaintiffs allege that "[d]ue to the Colorado Agents' visible weapon, their false claims of legal authority, their use of force, intimidation, and loud and belligerent demeanor, Dr. G was powerless to prevent them from entering his house over his objection." *Id.* at ¶ 140.

Once inside the G's residence, Defendants Adame and Garza "falsely claimed that Plaintiffs and the other Doe children were in the custody of the State of Kansas." *Id.* at ¶ 143. Although they allegedly found no evidence of "emergency conditions" that threatened the safety of the Plaintiffs or the other Doe children, Defendants Adame and Garza "commanded Mrs. Doe to vacate the G's home immediately." *Id.* at ¶ 142. Plaintiffs allege that Defendants Adame and

---

[8]Based upon other allegations in the First Amended Complaint, it would appear that Plaintiffs are alluding to the *Ex Parte* Orders issued by the District Court for Johnson County, Kansas on May 5, 2009. *See* First Amended Complaint at ¶¶ 150 and 172.

Garza Defendants "issued summary orders inside the G's house, both verbal and written, without a supporting court order, without prior notice, hearing or probable cause, which the G's, Mrs. Doe and the Doe children were forced to obey by virtue of the Colorado Agents' threats of force, intimidation and false claims of legal authority."[9] *Id.* at ¶ 146.

The First Amended Complaint also alleges that Defendant Adame signed a document that Plaintiffs refer to as the "Colorado Order." That document purportedly required Dr. and Mrs. G "to take custody of the Doe's children" and prohibited Mrs. Doe from having any "contact, physical or verbal with any of the children, including any communication through Dr. G and his wife Mrs. G or any third party." *Id.* at ¶¶ 147 and 151-52. Plaintiffs further assert that in a later telephone conversation with Dr. G, Defendant Adame "prohibit[ed] Dr. G from allowing Mr. Doe, or even his parents, to talk to the children on the phone or have any contact with them." *Id.* at ¶ 153. Defendants Adame and Garza purportedly "informed the G's that government agents from Kansas would arrive at an unspecified time/day to take physical custody of the Doe children from Dr. and Mrs. G." *Id.* at ¶ 161. That same day, after the exchange with Defendants Adame and Garza, Dr. G and his wife "personally transported the ten Doe children to Kansas from Colorado" and "delivered the Doe children the next day to the custody of SRS/DCF in

---

[9]*Compare Siliven v. Ind. Dep't of Child Servs.,* 635 F.3d 921, 926-27 (7th Cir. 2011) (recognizing, in a case where a parent agreed to remove their minor child from the family home and place him with his grandmother home when told that the child otherwise would be placed in foster care, that a Fourth Amendment seizure may occur where "coercive conduct on the part of the police . . . indicates cooperation is required;" the court concluded, however, that the defendants' conduct did not rise to the level of a Fourth Amendment violation because the information available to defendants "[was] sufficient to warrant a prudent caseworker in believing that [the minor child] was in danger"). *See also Schattilly v. Daugharty,* 656 F. App'x 123, 129-30 (6th Cir. 2016) (holding that officials did not violate the plaintiff's constitutional rights by threatening removal proceedings in order to obtain consent to temporary placement).

Johnson County.  *Id.* at ¶¶ 164 and 166.

The so-called "Colorado Order" is attached to the First Amended Complaint as Exhibit 2.

Notably, the word "order" does not appear any where in that document.  To the contrary, Exhibit

2 is captioned "Colorado Department of Social Services, Douglas County Department of Human

Services" and entitled "Safety Plan."  In addition to the provisions cited in the First Amended

Complaint, the Safety Plan apparently required Mrs. Doe "to contact Kansas casework; Monica

Gildner on 5/7/09."  At the bottom of the single-page document is space for the signatures of

"Safety Plan Participants and Parents" which is prefaced by the following:

> Family Agreement with Safety Plan
>
> We have participated in the development of and reviewed this safety plan and
> agree to work with the provisions and services as described above.[10]

Exhibit 2 bears two illegible signatures and is dated May 6, 2009.

This court finds the allegations in the First Amended Complaint are insufficient to allege

a violation of Plaintiffs' Fourth Amendment rights by either Defendant Adame or Garza.[11]  As

noted earlier, Fourth Amendment seizure requires an intentional acquisition of physical control.

If I credit Plaintiffs' own allegations, Defendants Adame and Garza announced that Plaintiffs

and the other Doe children already "were in the custody of the State of Kansas."  *See* First

---

[10]Colorado law provides that a county department of social services and "any person who is believed to be responsible for the abuse or neglect of a child" may enter into a safety plan agreement.  *See* Colo. Rev. Stat. § 19-3-309.5.  That statute further provides that "[p]articipation in a safety plan agreement by an county department and by any person who is believed to be responsible for child abuse or neglect shall be at the discretion of the person who is believed to be responsible for the child abuse or neglect."

[11]It bears noting that the First Amended Complaint does not assert any Fourth Amendment  claims on behalf of Dr. and Mrs. G, or Mrs. Doe.

Amended Complaint at ¶ 143.  If that allegation is accepted as true, the Safety Plan Agreement executed on May 6, 2009 did not further restrict Plaintiffs' freedom of movement.  That seems consistent with Dr. and Mrs. G's understanding and subsequent actions, since it is undisputed that they returned Plaintiffs and their siblings to Kansas that same night.  While the First Amended Complaint portrays the Defendants (and particularly Deputy Garza) as intimidating, loud and belligerent, those behaviors did not change Plaintiffs' status or restrict their movements.  I also do not find that the Safety Plan executed on May 6, 2009 was unreasonable for purposes of the Fourth Amendment in light of the findings contained in Judge Sloan's *Ex Parte* Orders which apparently were available to Defendants Adame and Garza.

Finally, and most importantly, I do not find that Plaintiffs have sustained their burden under the second prong of the qualified immunity analysis.  As the Supreme Court re-affirmed in *White,* the clearly established law element "must be 'particularized' to the facts of the case" and "should not be defined 'at a high level of generality."   In challenging Defendants' claim of qualified immunity under the Fourth Amendment, Plaintiffs' response brief relies on four reported decisions.  In *Jones v. Hunt*, 410 F.3d 1221 (10th Cir. 2005), the court held that a sixteen year old student was "seized" within the meaning of the Fourth Amendment when she was confronted at school and coerced into returning to live with her father.  The Tenth Circuit noted that the deputy sheriff and social worker repeatedly threatened the student with arrest if she did not comply with their directives.  The Tenth Circuit also found that the Fourth Amendment seizure "was not 'justified at its inception'" since there was no indication that the child's mother was suspected of abusive or neglectful behavior.  In *Gomes v. Wood*, 451 F.3d 1122 (10th Cir. 2006), parents brought a due process claim under the Fourteenth Amendment

after their minor daughter was removed from their home and placed in protective custody. In holding that the defendants were entitled to qualified immunity from the plaintiffs' claim for damages under the Fourteenth Amendment, the appellate court acknowledged that "[s]ocial workers face extreme difficulties in trying simultaneously to help preserve families and to serve the child's best interests" and are required to "balance the parents' interest in the care, custody and control of their children with the state's interest in protecting the children's welfare." *Id.* at 1138.

Plaintiffs also rely on two appellate decisions from other Circuits.[12]  The facts in *Wendrow v. Michigan Department of Human Services*, 534 F. App'x 516 (6th Cir. 2013) are demonstrably different from those in this case. In *Wendrow,* the Sixth Circuit held that a thirteen year old child was seized when she was removed from class and then interviewed by prosecutors and police officers in a separate area on school grounds. The child in question had been diagnosed with Asperger's syndrome. The court concluded that "it was objectively unreasonable for [defendants] to subject [this child] to an interview of this type without consent." In *Wooley v. City of Baton Rouge*, 211 F.3d 913 (5th Cir. 2000), a panel of the Fifth Circuit held that a minor child was "seized" in violation of the Fourth Amendment when he was physically removed from his home without a warrant or probable case. The court specifically found that it was not "objectively reasonable for the officers to believe that [the minor child] was in danger of

---

[12]I am not convinced these two cases demonstrate "the clearly established weight of authority from other courts" as contemplated by the qualified immunity doctrine. *See PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196-97 (10th Cir. 2010) ("A right is clearly established 'when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as [the] plaintiff maintains.'") (quoting *Harman v. Pollock*, 586 F.3d 1254, 1260 (10th Cir. 2009).

imminent harm" and further noted that the judicial order in the officers' possession "in no way indicated that [the minor child's] safety might be jeopardized."  Indeed, the appellate court noted that "the police were not informed of any abuse prior to arriving" at the child's home.

Here, Plaintiffs were not taken into custody by Defendants Adame and Garz.  Defendants were in possession of court orders that specifically found that "an emergency exists which threatens the safety of" the Plaintiffs, that "remaining in the home or returning home would be contrary to the welfare of the child, and that "immediate placement is in the best interest of the child."  Judge Sloan's *Ex Parte* Orders also referred to allegations of physical, sexual, mental, or emotional abuse involving these children.  Echoing the Supreme Court's observation in *White*, I find that Plaintiffs have "failed to identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment." Accordingly, I recommend that Defendants Adame and Garza be dismissed from the first claim for relief on the basis of qualified immunity.

### 2. *Plaintiffs' Third Claim Alleging A Fourteenth Amendment Violation*

In their Third Claim, Plaintiffs allege that Defendants Adame and Garza "caus[ed] Plaintiffs to be deprived of their familial associations in violation of the 14th Amendment."  *See* First Amended Complaint at ¶ 208.  More specifically, Defendants Adame and Garza allegedly prohibited "Plaintiffs from leaving [the G's residence] with their mother and . . . prohibit[ed] Plaintiffs, through written and verbal orders, from movement and travel with their mother, father, and grandparents."  Plaintiffs further allege that Defendants Adame and Garza knew their "actions could and did result in Plaintiffs' detention."  *Id.* at ¶ 205.

In moving to dismiss this claim, Defendants Adame and Garza argue, in rather cursory

fashion, that they placed only "limited restrictions" on Plaintiffs' interaction with their parents

that lasted "for a single day when [Plaintiffs] left [Colorado] without the permission or even

knowledge of Garza or Adame." *See* Motion to Dismiss, at 9. Defendants insist that they "are

not aware of any Constitutional right to uninterrupted familial relations in the face of credible

evidence of imminent danger of abuse" and that they

> acted reasonably when they determined that to protect the Plaintiffs and their
> siblings, it was best to separate them from their parents and leave them in the care
> of a family friend of the parents for a short time pending further investigation.

*Id.* Plaintiffs' analysis of their Fourteenth Amendment claim is equally perfunctory.

In addition to the factual allegations enumerated in support of Plaintiffs' Fourth

Amendment claim, the First Amended Complaint avers that after Plaintiffs and their siblings

returned to Johnson County on May 7, 2009, "SRS/DCF disregarded the children's best interest

and proceeded arbitrarily to separate them from each other, from their parents, from their

grandparents, from the G.'s and from anyone known to them, causing the children obvious

mental and physical anxiety, needless worry and grief." *See* First Amended Complaint at ¶ 168.

The Due Process Clause of the "Fourteenth Amendment provides that no state shall

'deprive any person of life, liberty, or property, without due process of law.'" *Estate of DiMarco*

*v. Wyo. Dept. of Corrections*, 473 F.3d 1334, 1339 (10th Cir. 2007) (quoting the Due Process

Clause of the U.S. Const. amend. XIV, § 1). "The Supreme Court's interpretation of this clause

recognizes two different kinds of constitutional protection: procedural due process and

substantive due process." *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994). "In its

substantive mode, the Fourteenth Amendment provides protection against arbitrary and

oppressive government action, even when taken to further a legitimate governmental objective."

*Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008). One strand of the substantive due process doctrine "protects an individual's fundamental liberty interest, while the other protects against the exercise of governmental power that shocks the conscience." *Id.* Plaintiffs' Third Claim fails under either application of the substantive due process doctrine.

The "protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Becker v. Kroll*, 494 F.3d 904, 923 (10th Cir. 2007) (quoting *Albright v. Oliver*, 510 U.S. 266, 272 (1994)). *See also Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 851 (1992) (acknowledging that constitutional protections extend to personal decisions relating to, *inter alia*, family relationships and child rearing, and that Supreme Court precedents "have respected the private realm of family life which the state cannot enter"). As the Tenth Circuit noted in *Starkey ex rel. A.B. v. Boulder County Social Services*, 569 F.3d 1244, 1253 (10th Cir. 2009) (internal citations omitted),

> "[T]he Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." But this right to family integrity "has never been deemed absolute or unqualified." "Courts have recognized that the constitutional right to familial integrity is amorphous and always must be balanced against the governmental interest involved."

*Cf. Tenenbaum v. Williams*, 193 F.3d 581, 601 (2d Cir. 1999) ("It does not follow from the principle that brief seizures of people may be unreasonable and therefore violate the Fourth Amendment that brief removals [of minor children] from their parents to protect them from abuse are 'without any reasonable justification in the service of a legitimate government objective' under the Due Process Clause.") (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

24

The Tenth Circuit also addressed the constitutionally protected right of familial association in *Silvan W. v. Briggs*, 309 F. App'x 216, 223 (10th Cir. 2009). There, the court acknowledged that:

> The substantive component of the Fourteenth Amendment "protects an individual's fundamental liberty interests" and guards "against the exercise of governmental power that shocks the conscience." * * * The right of familial association arises from the concept of ordered liberty. It is violated when government officers intend to interfere with a protected relationship and the reason for interfering "constitute[s] an undue burden on [the plaintiffs'] associational rights."

*Id.* (internal citations omitted). In *Silvan,* the Tenth Circuit found no evidence that plaintiffs' familial association rights were unduly burdened where defendants acted "on the basis of a reasonable suspicion of past and impending harm." The court concluded that plaintiffs' associational rights "[did] not outweigh the government's 'interest in protecting [the minor child] from abuse and from situations where abuse might occur.'" *Id.* (citing *Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993)). *Cf. Vigil v. S. Valley Acad.*, No. 06-2309, 247 F. App'x 982, 988 (10th Cir. 2007) ("a plaintiff claiming a violation of the right to familial association must show that the defendant had the specific intent to interfere with the family relationship"). *Cf. Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1222 (10th Cir. 2006) (noting that to properly allege a substantive due process violation, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power") (quoting *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006)).

Although I accept as true the well-pled allegations of the First Amended Complaint, I do not find that Plaintiffs have alleged facts that rise to the level of a plausible substantive due

process violation by Defendants Adame and Garza.[13]  Stated differently, the allegations in the First Amended Complaint do not plausibly demonstrate that Defendants Adame and Garza on May 6, 2009 intended to interfere with a protected relationship or that the Safety Plan they put in place on that day constituted "an undue burden" on Plaintiffs' right of familial association.

Plaintiffs' allegations make clear that even if Defendants' underlying assumptions may have been incorrect or misguided, they were acting in response to the *Ex Parte* Orders issued by the District Court of Johnson County. *See* First Amended Complaint at ¶ 132 (Defendants represented that "they were in possession of a court order from the State of Kansas"). *Cf. Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (to prove a due process violation of the right to familial association, it is not enough to show that the government action was "incorrect or ill-advised").  The allegations in the First Amended Complaint also demonstrate Defendants' appreciation of their limited role on May 6, 2009.  *See* First Amended Complaint at ¶¶ 143 and 161 (Defendants Adame and Garza stated that "Plaintiffs and the other Doe children were in the custody of the State of Kansas" and that "government agents from Kansas would arrive at a unspecified time/day to take physical custody of the Doe children from Dr. and Mrs. G").  The Safety Plan put in place by Defendants Adame and Garza specifically directed Mrs. Doe to contact Ms. Gildner, the social worker in Kansas, the very next day (May 7, 2009), presumably to discuss the children's current and future situation.  *Cf. Cox*, 654 F.3d at

---

[13]In reaching this conclusion, the court expresses no views as to the actions of other Defendants taken either before or after May 6, 2009.  Under § 1983, the court must consider to what extent, if at all, Defendants Adame and Garza personally participated in the alleged constitutional violations because to assert a viable claim under § 1983, the plaintiff must plausibly allege that the defendant's own individual actions violated the Constitution.  *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

275 ("Absent truly extraordinary circumstances, a brief deprivation of custody is insufficient to

state a substantive due process custody claim."); *Silvan*, 309 F. App'x at 223 (in finding that the

defendants had not violated plaintiffs' familial association rights, the court noted "the relatively

short duration" of the child's placement with her aunt and uncle and cited with favor *Nicholson*

*v. Scoppetta*, 344 F.3d 154, 172 (2d Cir. 2003) which held that "brief removals generally do not

rise to the level of a substantive due process violation, at least where the purpose of the removal

is to keep the child safe during investigation and court confirmation of the basis for removal");

*Wofford v. Evans*, No. 7:02CV00762, 2002 WL 32985799, at *7 (W.D. Va. Dec. 17, 2002)

(holding that state action that affects a familial relationship only incidentally is not cognizable in

a § 1983 due process claim).  There is absolutely no allegation that Defendant Adame or

Defendant Garza had any role or input in the subsequent decision by Kansas authorities to

separate the Doe children "from each other, from their parents, from their grandparents, from the

G's and from anyone known to them."

Finally, in finding that Defendants Adame and Garza must be dismissed from Plaintiffs'

Third Claim on the basis of qualified immunity, I remain mindful of the Tenth Circuit's

observations regarding the "difficult and essential" judgments that social workers must make

when they are confronted with allegations of child abuse and are forced to make "on-the-spot

judgments on the basis of limited and often conflicting information."  *Gomes*, 451 F.3d at 1138.

*Cf. Hedger v. Kramer*, No. CIV-13-0654-HE, – F. Supp. 3d –, 2016 WL 3945816, at *9 (W.D.

Okl. Jul. 19, 2016) (heeding "the Tenth Circuit's admonition that 'considerable deference should

be given to the judgment of responsible government officials in acting to protect children from

perceived imminent danger or abuse"), *appeal pending*.  "'[I]f officers of reasonable competence

could disagree' about the lawfulness of the challenged conduct, then '[qualified] immunity should be recognized." *Gomes,* 451 F.3d at 1136 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

> "Officials do not lose their qualified immunity because of a mistaken, yet reasonable belief, nor do officials lose their immunity because of a reasonable mistake as to the legality of their actions."   "[T]he purpose of the qualified immunity doctrine is to provide ample room for mistaken judgments and to protect 'all but the plainly incompetent or those who knowingly violate the law.'"

*Dupree v. City of Jacksonville*, No.4:08CV00327 JMM, 2009 WL 1392578, at *6 (E.D. Ark. May 13, 2009) (internal citation omitted).

Accordingly, I recommend that Defendants Adame and Garza be dismissed from Plaintiffs' Third Claim for Relief based upon the doctrine of qualified immunity.[14]

C.     The Claim Against Defendant Douglas County

The Sixth Claim in the First Amended Complaint asserts that "[u]nder 42 U.S.C. § 1983,

---

[14]If the substantive claims against Defendants Adame and Garza are dismissed pursuant to this Recommendation, those Defendants also must be dismissed under Plaintiffs' Fourth Claim which alleges they participated in a conspiracy to deprive Plaintiffs of their constitutional rights. *See Fernandez v. N. Kern State Prison*, No. 1:16-cv-1612 AWI JLT, 2016 WL 7324708, at *6 (E.D. Cal. Dec. 16, 2016) (holding that "[b]ecause Plaintiff's complaint fails to allege any substantive claims . . . it follows that Plaintiff's claim for civil conspiracy must be dismissed"). *Cf. Aleynikov v. McSwain*, No. 15-1170 (KM), 2016 WL 3398581, at *19 (D. N.J. Jun. 15, 2016) (citing the "established rule . . . that a cause of action for civil conspiracy requires a separate underlying tort as a predicate for liability;" because the court found no violation of the plaintiff's constitutional rights, the companion conspiracy claim was dismissed), *clarified on other issues,* 2016 WL 5340513 (D. N.J. Sep. 22, 2016); *Everling v. Ragains*, No. 1:14-cv-00024-TWP-DML, 2015 WL 1319707, at *5 (S.D. Ind. Mar. 23, 2015) (holding that in the absence of an underlying substantive claim, plaintiff's conspiracy cause of action must be dismissed; "[b]ecause all the federal claims under 42 U.S.C. § 1983 are barred by prosecutorial immunity, there is no underlying cause of action on which to base a conspiracy claim").  Also, because this court is recommending Defendants Adame's and Garza's dismissal based upon qualified immunity, there is no need to address their statute of limitations affirmative defense.

Douglas County is liable for causing Plaintiffs to be seized and deprived of their liberty in violation of the 4th Amendment of the United States Constitution."  Plaintiffs allege in conclusory fashion that "Douglas County had adopted an unwritten policy, custom, or practice by which it authorized county sheriff's personnel to seize Plaintiffs based on out-of-state *ex parte* court orders in violation of the United States Constitution and Colorado law."  *See* First Amended Complaint, at ¶ 216.

This claim cannot survive if Defendants Adame and Garza are dismissed from this action.  It is axiomatic that a local government body cannot be liable for damages if the plaintiff suffered no constitutional injury at the hands of a government employee.  *See, e.g., City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (*per curiam*); *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1264 (10th Cir. 2008).  *Cf. Maco v. Baldwin Union Free Sch. Dist.*, No. CV 15-3958, 2016 WL 4028274, at *6 (E.D.N.Y. Jul. 26, 2016) ("[W]here there is no underlying violation of a plaintiff's constitutional rights, any claim for municipal liability necessarily fails as well."); *Bonilla, v. City of York*, No. 1:14-CV-2238, 2016 WL 3165619, at *12 (M.D. Pa. Jun. 7, 2016) ("[T]here is no municipal liability under *Monell* where there is no underlying violation of a constitutional right by the individual officers."), *appeal pending*; *Caputo v. Rio Ranche Police Dep't*, No. CIV 05-321-JB/DJS, 2006 WL 4063020, at *9 (D.N.M. Jun. 30, 2006) (while the acts of a single employee may sometimes give rise to a *Monell* claim, "such a *Monell* claim still requires that a constitutional violation occurred").

II.     *The Kansas Defendants' Challenge to Personal Jurisdiction*

Where a defendant is moving to dismiss under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction and under Fed. R. Civ. P. 12(b)(6) for failure to state a cognizable claim for

relief, the court should first address the challenge to personal jurisdiction.  "The question of personal jurisdiction must be addressed before a court can reach the merits of a case, because 'a court without jurisdiction over the parties cannot render a valid judgment.'"  *Doe v. May*, No. 14-cv-01740-WJM-NYW, 2015 WL 8519519, at *3 (D. Colo. Nov. 16, 2015) (quoting *Omi Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998)), *rec. adopted,* 2015 WL 8479808 (D. Colo. Dec. 10, 2015).

In every action, the plaintiff bears the burden of establishing personal jurisdiction over a non-resident defendant.  *See Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).  "In the preliminary stages of litigation, Plaintiff's burden is light."  *Walker v. Wegener*, No. 11-CV-3238-PAB-KMT, 2012 WL 1020673, at *3 (D. Colo. Mar. 2, 2012) (citing *Wenz*, 55 F.3d at 1505), *rec. adopted*, 2012 WL 1020954 (D. Colo. Mar. 26, 2012).  "Where, as here, there has been no evidentiary hearing, and the motion to dismiss for lack of personal jurisdiction is decided on the basis of affidavits and other materials, Plaintiff[ ] need only make a *prima facie* showing that jurisdiction exists."  *Id*. at *3 (internal citation omitted).  *See also Pytlik v. Prof'l Res., Ltd.*, 887 F.2d 1371, 1376 (10th Cir. 1989) (Plaintiff "has the duty to support jurisdictional allegations in a complaint by competent proof of the supporting facts if the jurisdictional allegations are challenged by an appropriate pleading").  This court must resolve any factual disputes in Plaintiffs' favor.  *See Beyer v. Camex Equip. Sales & Rentals, Inc.*, No. 10-CV-01580-WJM-MJW, 2011 WL 2670588, at *2 (D. Colo. July 8, 2011) ("Any factual conflicts must be resolved in the plaintiff's favor."), *aff'd,* 465 F. App'x 817 (10th Cir. 2012).  "However, 'only the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true."  *Wise v. Lindamood,* 89 F. Supp. 2d 1187, 1189 (D. Colo.

1999). The court also should accept as true those facts presented in defendant's affidavits or exhibits that remain unrefuted by plaintiff. *See Glass v. Kemper Corp.*, 930 F. Supp. 332, 337 (N.D. Ill. 1996).

Here, both the Kansas Defendants and Plaintiffs have attached exhibits to their motion and response brief, respectively. *"*A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of . . . personal jurisdiction," without converting "the motion into one for summary judgment; 'the plain language of Rule 12(b) permits only a 12(b)(6) motion to be converted into a motion for summary judgment.'" *1-800-Contacts, Inv. v. Mem'l Eye, PA*, No. 1:08-CV-983 TS, 2009 WL 1586654, at *1 n.1 (D. Utah, Jun. 4, 2009). *Cf. Rich Food Servs., Inc. v. Rich Plan Corp.,* No.5:99-CV-677-BR, 2001 WL 36210598, at *9 n.2 (E.D.N.C. May 12, 2001) ("Rule 12(b) does not impose a restriction on [a] trial court in considering matters outside the pleadings in ruling on a motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction"); *Sunwest Silver, Inc. v. Int'l Connection, Inc.* 4 F. Supp. 2d 1284, 1285 (D. N.M. 1998) ("The submission of affidavits in connection with a motion to dismiss for lack of personal jurisdiction does not convert the motion into one for summary judgment, thus, the court examines this jurisdictional issue pursuant to the standards applicable to a Rule 12(b)(2) motion.").

"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show both that jurisdiction is proper under the laws of the forum state and that the exercise of jurisdiction would not offend due process." *Intercon, Inc. v. Bell Atl. Internet Sols.*, 205 F.3d 1244, 1247 (10th Cir. 2000) (citation omitted). Because Colorado's long-arm statute permits the exercise of any jurisdiction that is consistent with the United States Constitution, the

personal jurisdiction inquiry under Colorado law "collapses into the single due process inquiry." *Id.* at 1247 (citation omitted). *See also Beyer*, 2011 WL 2670588, at *3 (The court "need only address the constitutional question of whether the exercise of personal jurisdiction over [Defendants] comports with due process.").

"The Due Process Clause permits the exercise of personal jurisdiction over a nonresident defendant so long as there exist minimum contacts between the defendant and the forum State." *Intercon,* 205 F.3d at 1247 (internal quotation marks and citation omitted). The minimum contacts requirement protects a defendant from "being subject to the binding judgment of a forum with which [it] has established no meaningful contacts, ties, or relations." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (internal quotation marks and citation omitted). The defendant must have "fair warning that a particular activity may subject [it] to the jurisdiction of a foreign sovereign." *Id.* at 472. "[T]he question of whether a non-resident defendant has the requisite minimum contacts with the forum state to establish in personam jurisdiction must be decided on the particular facts of each case." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1076 (10th Cir. 2004) (internal quotation marks omitted).

In this case, Plaintiffs are asserting the court has specific personal jurisdiction over the Kansas Defendants. "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore* , 571 U.S. __, 134 S. Ct. 1115, 1121 (2014). As the Supreme Court explained in *Walden*, the

> "minimum contacts" analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there. . . . But the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the

forum State that is the basis for its jurisdiction over him.

*Id.* at 1122.  *Cf. Giduck v. Niblett*, No. 13CA0775, 2014 WL 2986670, at *5 (Colo. App. Jul. 3, 2014) ("[i]n properly viewing the focus of the minimum contacts analysis, . . . it is the defendants, not plaintiffs or third parties, who must create contacts with the forum state . . . ."), *cert. dismissed*, Aug. 28, 2015.

"[A] court may, consistent with due process, assert specific jurisdiction over a nonresident defendant if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Intercon,* 205 F.3d at 1247 (citation omitted). "[P]urposeful direction exists when there is 'an intentional action . . . expressly aimed at the forum state . . . with [the] knowledge that the brunt of the injury would be felt in the forum state,'" and the "plaintiff's injuries must 'arise out of [the] defendant's forum-related activities." *Anzures v. Flagship Restaurant Group*, 819 F.3d 1277, 1280 (10th Cir. 2016) (quoting *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1071-72 (10th Cir. 2008)).  "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1419 (10th Cir. 1988) (quoting *Burger King*, 471 U.S. at 474-75).  *Cf. New Frontier Media, Inc. v. Freeman*, 85 P.3d 611, 614 (Colo. App. 2003) (contacts that exist with a state due to a plaintiff's unilateral acts have been held insufficient to establish personal jurisdiction).

For this court to assert personal jurisdiction over the Kansas Defendants, there must be more than "mere injury to a forum resident." *Walden,* 134 S. Ct. at 1125.  Indeed, the Tenth

Circuit has acknowledged that "personal jurisdiction cannot be based on a [defendant's] interaction with a plaintiff known to bear a strong connection to the forum state." *Rockwood Select Asset Fund XI(6)-1, LLC v. Devine, Millimet & Branch*, 750 F.3d 1178, 1180 (10th Cir. 2014) (citing *Walden*, 134 S. Ct. at 1122-26)).  In this case, it seems clear that on May 6, 2009, Plaintiffs did not qualify as residents of Colorado or have a strong connection with Colorado.[15] In reaching that conclusion, I find instructive the Colorado Supreme Court's analysis in *Brandt v. Brandt*, 268 P.3d 406 (Colo. 2012).  Although that case arose under the Uniform Child Custody Jurisdiction and Enforcement Act and considered when a non-issuing jurisdiction could modify an out-of-state custody order, the Colorado Supreme Court held that a determination of where a parent and child "presently reside" for purposes of a residency determination must be based on a "totality of the circumstances determination." *Id.* at 415.  Factors that should be weighed include:

> the length and reasons for the parents' and the child's absence from the issuing state; their intent in departing from the state and returning to it; . . . where they maintain a home, car, driver's license, job, professional licensure, and voting registration; where they pay state taxes; the issuing state's determination of residency based on the facts and the issuing state's law; and other circumstances demonstrated by evidence in the case.

*Id.*  This court has not been provided with any evidence that would suggest Plaintiffs qualified as "residents" of Colorado on May 6, 2009.  With the recommendation to dismiss the claims against Defendants Douglas County, Adame, and Garza, the remaining parties to this action were all Kansas residents at the time of the relevant conduct in 2009.

---

[15]The First Amended Complaint alleges that at all relevant times in 2009, Plaintiffs, as well as their parents, and their siblings, were residents of the State of Kansas and resided in Johnson County, Kansas.  *See* First Amended Complaint at ¶ 16.

Moreover, I do not find that the Kansas Defendants' very brief contact with Colorado officials is sufficient to demonstrate that these Defendants "purposefully directed" their activities at this forum with "[the] knowledge that the brunt of the injury would be felt in the forum state." I also do not find that any violation of Plaintiffs' constitutional rights arose "out of [the] defendant's forum-related activities."

The First Amended Complaint alleges that on April 20, 2009, Defendant Gildner allegedly enlisted the assistance of Assistant District Attorney Jaclynn J.B. Moore, "who filed ten Child-in Need-of-Care ("CINC") petitions in the District Court for Johnson County, Kansas." *See* First Amended Complaint at ¶ 85. A "non-emergency hearing" on those petitions was set for May 11, 2009 in the District Court for Johnson County. *Id.* at ¶ 92. Thereafter, on May 4, 2009, Assistant District Attorney Donald W. Hymer, Jr. moved for issuance of *Ex Parte* Orders of Protective Custody Pursuant to K.S.A 38-2242 in the District Court of Johnson County, Kansas. *Id.* at ¶ 111. *See also* Exhibit A (doc. #64-1) attached to Motion to Dismiss. *Cf. Fitzgerald v. Zakheim & Lavrar, P.A*, 90 F. Supp. 3d 867, 873 (D. Minn. Feb. 11, 2015) (holding that the defendant law firm did not "purposely direct" its actions at a Minnesota resident when it obtained from a Florida state court a writ of garnishment aimed at an individual the defendant believed resided in Florida). Plaintiffs contend that after Dr. and Mrs. G returned the Doe children to Kansas on May 7, 2009, "SRS/DCF [the Kansas Defendants' employer] . . . proceeded arbitrarily to separate them from each other, from their parents, from their grandparents, from the G's and from anyone known to them." The "purposeful activities" which form the basis for the instant action all took place in Kansas and the consequences of the Kansas Defendants' conduct also were felt in that state. Accordingly, I do not find that the Kansas

Defendants had sufficient contacts with Colorado to permit this court to exercise specific personal jurisdiction over those individuals.

"Even if defendant's actions created sufficient minimum contacts," the court "must still consider whether the exercise of personal jurisdiction over defendant would offend traditional notions of fair play and substantial justice." *Intercon*, 205 F.3d at 1247 (internal quotation marks and citation omitted). "This inquiry requires a determination of whether the district court's exercise of jurisdiction over defendant is reasonable in light of the circumstances surrounding the case." *Id.* The court considers the following factors in deciding whether the exercise of jurisdiction is reasonable: "(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies." *Id.* at 1249.

> In assessing the reasonableness of jurisdiction, we also take into account the strength of a defendant's minimum contacts. [T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction.

*Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1161-62 (10th Cir. 2010) (internal citations omitted). The Supreme Court has cautioned that "jurisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent." *Burger King*, 471 U.S. at 478.

On balance, I am not convinced that exercising personal jurisdiction over the Kansas

Defendants in Colorado would comport with traditional notions of fair play and substantial justice. Colorado does not appear to be the most efficient place to litigate the dispute, and certainly does not have a greater interest in protecting the interests of the children in this case than Kansas. To the contrary, this action arises out of orders issued by the District Court for Johnson County, Kansas. I have no reason to believe that proceeding against the Kansas Defendants in that forum would impose undue burdens on Plaintiffs or impair their ability to resolve their claims on the merits. Basic notions of due process mandate that this case proceed, if at all, in the District of Kansas.

In lieu of dismissing the claims against the Kansas Defendants, the court may exercise its discretion and transfer the remaining claims and parties to the District of Kansas pursuant to 28 U.S.C. § 1631. That statute provides that if a court finds that it lacks personal jurisdiction, it "shall, if it is in the interests of justice, transfer such action . . . to any other such court in which the action . . . could have been brought at the time it was filed." *Cf. Doe v. May*, 2015 WL 8519519, at *5; *Reynolds v. Henderson & Lyman*, No. 13-cv-03283-LTB, 2014 WL 5262174, at *4-5 (D. Colo. Oct. 14, 2014). It would appear that Plaintiffs could have brought their claims against the Kansas Defendants originally in that forum. I further find that transferring this action to the District of Kansas would further the interests of justice, particularly if Plaintiffs' claims might be time-barred if filed anew in that jurisdiction. At this point, I cannot say with certainty that Plaintiffs' claims against the Kansas Defendants are "unlikely" to have merit, just as I will not presume that Plaintiffs are pursuing their claims in bad faith. On balance, I recommend that the action and the remaining claims against Defendants Gildner, Webb and Abney be transferred

to the District of Kansas.[16]

## CONCLUSION

Accordingly, for the reasons set forth above, this court RECOMMENDS that the Motion to Dismiss Amended Complaint (doc. #57) filed by Defendants Lesa Adame, Carl Garza, and Douglas County be GRANTED and that the claims against those defendants be dismissed with prejudice.  I further RECOMMEND that Defendants Monica Gildner, Angela Webb, and Tina Abney's Motion to Dismiss First Amended Complaint with Memorandum in Support or, in the alternative, Motion for Summary Judgment (doc. #65) be DENIED WITHOUT PREJUDICE, and that this case and the claims against Defendants Gildner, Webb, and Abney be transferred to the United States District Court for the District of Kansas pursuant to 28 U.S.C. § 1631.

DATED this 27th day of January, 2017.

BY THE COURT:

s/ Craig B. Shaffer
United States Magistrate Judge

---

[16]In view of this Recommendation, the court need not address the substantive arguments advanced in the Kansas Defendants' motion to dismiss.  Those arguments should be resolved by the assigned judicial officer in the District of Kansas.