**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**July 3, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

N.E.L.; M.M.A.,

    Plaintiffs - Appellants,

v.

DOUGLAS COUNTY, COLORADO;
LESA ADAME, in her individual capacity;
CARL GARZA, in his individual capacity,

    Defendants - Appellees,

and

MONICA GILDNER, in her individual
capacity; ANGELA WEBB, in her
individual capacity; TINA ABNEY, in her
individual capacity,

    Defendants.

No. 17-1120
(D.C. No. 1:15-CV-02847-REB-CBS)
(D. Colo.)

## ORDER AND JUDGMENT[*]

Before **PHILLIPS**, **KELLY**, and **McHUGH**, Circuit Judges.

    Kansas child-and-family-services employees obtained an ex parte order from a

Kansas state court to take physical custody of ten minor children. Because the

children were with their mother visiting her college friends in Douglas County,

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Colorado, the Kansas family-services employees somehow arranged for a counterpart in Colorado, along with a local deputy sheriff, to execute the ex parte Kansas order.[1] Two of the minor children, N.E.L. and M.M.A. (after reaching the age of majority), sued the Kansas and Colorado governmental employees, as well as Douglas County, Colorado, under 42 U.S.C. § 1983 in the United States District Court for the District of Colorado.

The Colorado district court dismissed the claims against Douglas County and the Colorado governmental employees under Federal Rule of Civil Procedure 12(b)(6) and transferred the claims against the Kansas defendants to the United States District Court for the District of Kansas. N.E.L. and M.M.A. now appeal the dismissal of their claims against the Colorado defendants.[2] Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

### A. The First Amended Complaint's Allegations[3]

---

[1] The First Amended Complaint doesn't specify which Kansas employees communicated with the Colorado employees or in what order the communications occurred.

[2] N.E.L. and M.M.A. do not appeal the transfer of their claims against the Kansas defendants.

[3] When reviewing Rule 12(b)(6) dismissals, we accept the well-pleaded allegations of the complaint as true and view them in the light most favorable to the plaintiff. *Jones v. Hunt*, 410 F.3d 1221, 1223 (10th Cir. 2005).

N.E.L., M.M.A., and their eight siblings lived with their parents, Mr. and Mrs.

Doe, in Johnson County, Kansas. In spring 2008, "one of the younger" Doe children

"began exhibiting troubling behavior and making troubling comments" that suggested

Mrs. Doe's brother, the children's uncle, had sexually abused her in 2006 or earlier.

J.A. at 15–16 ¶¶ 18–19. Alarmed by these revelations, the Does sought counseling for

the girl and any siblings who may have witnessed the abuse. In June 2008, the Does

reported the alleged sexual abuse to the Kansas Department of Children and Families.

The Does told agency employees that since 2006 they had barred the suspected uncle

and all other members of Mrs. Doe's family from any contact with the children.[4] The

Kansas Department of Children and Families assigned Monica Gildner, a defendant

in this case, to serve as the Does' social worker.

On June 13, 2008, after the Does made the report, Gildner conducted a safety

assessment of the Doe home and found no evidence that the Does "were neglecting

their children's physical needs." *Id.* at 16 ¶ 26(f). Gildner then referred the allegedly

abused child to a facility called the Sunflower House, where staff interviewed the

child and three of her older siblings. In her Sunflower House interview, the child

repeated her allegations. Gildner never interviewed the child. The child later shared

more details of the abuse with her parents, and the Does reported these additional

---

[4] N.E.L. and M.M.A. don't disclose why the Does ceased contact with all Mrs.
Doe's relatives, not just her brother.

details to the Kansas Department of Children and Families. In response to these additional allegations, Gildner referred the child back to the Sunflower House.

In December 2008, a second Doe child reported sexual abuse by the same uncle.[5] As with the first child, Gildner referred this child to the Sunflower House for an interview.

Despite the two children's reports, "Gildner took a position that the abuse never occurred," *Id.* at 18 ¶ 42, and then "engaged on a course of conduct to smear Mrs. Doe." *Id.* at 18 ¶ 43. Specifically, Gildner "baselessly pronounced that Mrs. Doe had post-partum depression and mental instability." *Id.* at 18–19 ¶ 45. Gildner also "took a position that Mrs. Doe" and "the Doe children needed counseling to overcome their supposed false beliefs about the abuse."  *Id.* at 19 ¶¶ 48, 49.

Mrs. Doe agreed to go to counseling "in an effort to satisfy Gildner's outrageous demands that she do so." *Id.* at 19 ¶ 50. Despite her efforts, Gildner told the Does that if they "pursued legal action against the [uncle], either civilly, criminally, or through further investigation" by the Kansas Department of Children and Families, "the children would be harmed by 'borderline emotional abuse.'" *Id.*  at 19 ¶ 51. So the Does "attempted to cease contact with Gildner," communicating this desire to Angela Webb and Tina Abney, Gildner's supervisors at the Kansas Department of Children and Families (and also defendants in this case). *Id.* at 19 ¶ 53. "Gildner retaliated by threatening to initiate a court action," and by requiring that

---

[5] The First Amended Complaint doesn't specify when the alleged abuse occurred.

the entire family participate in counseling through Family Preservation Services. *Id.*

at 20 ¶ 58. Through this counseling, Gildner intended to dissuade the Does and their

children from believing the abuse allegations. Instead of participating in Family

Preservation Services, Mrs. Doe informed Gildner she would "seek counseling

services through Catholic Charities," and Gildner didn't object. *Id.* at 20 ¶ 62.

In February 2009, Gildner received two additional reports that the second-

reporting Doe child had been sexually abused.[6] When Gildner failed to act, Mr. Doe

filed a formal complaint with the Kansas Department of Children and Families.

Despite the complaint, Gildner remained the Does' primary contact for the case, and

she opposed having the reporting children undergo further interviews or medical

exams. After Mr. Doe met with Gildner concerning the children's abuse claims,

Gildner "threatened him" and said that she'd "possibly have to staff the case with the

District Attorney's Office and possibly get the Court involved" if the Does refused to

participate in Family Preservation Services. *Id.* at 21–22 ¶¶ 73–74. After Gildner

issued this warning, she met with Abney and Webb. Together, they decided that if the

Does refused to participate in Family Preservation Services, Gildner would ask the

District Attorney to file child-in-need-of-care petitions for the Doe children. Then in

---

[6] The First Amended Complaint doesn't identify who made these reports to
Gildner.

March 2009, the Does reported to the Kansas Department of Children and Families that the same uncle had sexually abused a third child of theirs.[7]

On April 20, 2009, in the Johnson County, Kansas district court, Gildner filed ten child-in-need-of-care petitions, one for each Doe child.[8] The petitions sought to terminate the Does' parental rights, to appoint a permanent custodian for the Doe children, to remove the children temporarily from the Does' custody, and to require the Does to pay child support. That same day, the court set the petitions "for a non-emergency hearing three weeks later, on May 11, 2009," *id.* at 25 ¶ 92, and appointed a Guardian Ad Litem (GAL) for the ten Doe children.

Just eight days after Gildner filed the petitions, Mr. Doe communicated with Abney to express his willingness to participate in Family Preservation Services, but Abney referred him to Gildner. Mr. Doe instead communicated with Webb, but she too referred him to Gildner.

On April 30, 2009, a Doe relative called Gildner and asked her whether the Does had "left town" and taken their children with them. *Id.* at 25 ¶ 100. That same day, Gildner called Mr. Doe and left him a message about Family Preservation Services but made no further effort to contact him for the next four days.

On May 4, 2009, Gildner "decided to make an uninvited visit to the Doe home," even though she knew that the family, except Mr. Doe, had gone to Douglas

---

[7] Again, the First Amended Complaint doesn't specify when the alleged abuse happened.

[8] At the time, the Doe children ranged in age from six months to thirteen years.

County, Colorado to visit the Does' college friends, Dr. and Mrs. G. *Id.* at 26 ¶ 104.

Mr. Doe met Gildner outside the home, telling her that "all contact needed to be

through his attorney, whose name he provided." *Id.* at 26 ¶ 105. When local police

officers asked for Dr. and Mrs. G's address, Mr. Doe provided it.

On May 5, 2009, Gildner, Abney, and Webb sought an ex parte protective-

custody order for each Doe child.[9] That same day, the Kansas state court issued the

orders, concluding (1) that "[r]easonable efforts have been made and have failed to

maintain the family and prevent the unnecessary removal of the [children] from"

their home and (2) that "reasonable efforts are not required to maintain the child[ren]

in the home because an emergency exists which threatens the safety of the

child[ren]." J.A. at 47.[10] The court also found that "remaining in the home or

returning home would be contrary to the welfare of the child[ren]" and that

"immediate placement is in the best interest of the child[ren]" because:

> after the child in need of care petitions were filed alleging physical,
> sexual, mental, or emotional abuse, it is reported that the children have
> been taken out of the area. The father was contacted on May 4, 2009,
> and he would not provide any information on the whereabouts of the
> children. The whereabouts and safety of the children are unknown.

*Id.*

---

[9] N.E.L. and M.M.A. attached to the First Amended Complaint one of the
Kansas ex parte orders as an example. Because they refer to this example in their
complaint and the order is central to their claims, we consider it. *Gee v. Pacheco*, 627
F.3d 1178, 1186 (10th Cir. 2010).

[10] The court issued an order for each child, but N.E.L. and M.M.A. provide us
with only one order as an example.

Despite these conclusions, the issuing judge left blank some parts of the protection-order forms. In the section concerning custody, for example, the judge didn't list where the children should be placed once recovered. And the judge didn't check the box that, if so marked, would have denied Mr. and Mrs. Doe visitation rights during their children's protective custody. Further, the judge didn't check a box empowering law-enforcement officers to take physical custody of the children. Nor did the judge check another box providing for a restraining order (with a corresponding blank space to identify who would be restrained). And the court didn't set a hearing date.

After obtaining the ex parte orders, Gildner, Abney, and Webb began "working" with Lesa Adame, a social worker at the Colorado Department of Social Services and the Douglas County Department of Human Services, and Carl Garza, a deputy in the Douglas County Sheriff's Office, "in meetings and over the phone and by other means of electronic communication." *Id.* at 40 ¶ 194. Together, the group "conspired and agreed to deprive" N.E.L., M.M.A., and the eight other Doe children of their rights. *Id.* at 41 ¶ 194.

Despite state laws, chiefly the Colorado Uniform Child-Custody Jurisdiction and Enforcement Act (Colorado UCCJEA), Colo. Rev. Stat. §§ 14-13-101 to -403

(2009), requiring them to do so, Adame and Deputy Garza didn't register the Kansas ex parte protection order with a Colorado court before executing it.[11]

On May 6, 2009, the day after the court entered the ex parte protection orders, Adame and Deputy Garza took the orders to Dr. and Mrs. G's home. Deputy Garza and Adame arrived at the home in his patrol car and together went to the front door. After Dr. G answered the door, Adame or Deputy Garza told him that they had a Kansas court order "to seize custody of all ten" Doe children and "demanded entry and custody of the children."[12] *Id.* at 32 ¶ 132. Adame told Dr. G that employees of the Kansas Department of Children and Families had sought her assistance.

Faced with this alarming situation, Dr. G called an attorney for advice. Acting on the attorney's advice, Dr. G asked Adame and Deputy Garza to produce a warrant. Either Adame or Deputy Garza[13] responded that they weren't required to obtain a

---

[11] *See* Colo. Rev. Stat. Ann. § 14-13-204 (official comment) ("In order for a protective order that contains a custody determination to be enforceable in another State it must comply with the provisions of [the Colorado UCCJEA] and the [Parental Kidnapping Prevention Act]."); *id.* § 14-13-102 (official comment) ("The definition of 'child-custody proceeding' has been expanded . . . . The inclusion of proceedings related to protection from domestic violence is necessary . . . ."); *see also id.* § 14-11-101(4) ("Notwithstanding [normal docketing procedures required for out-of-state decrees], a child-custody determination, as that term is defined in section 14-13-102(3), issued by a court of another state shall be registered in accordance with section 14-13-305.").

[12] The First Amended Complaint doesn't specify which person made these statements.

[13] Nor does the First Amended Complaint specify which person made this statement.

warrant to enter, claiming that "[w]e do this all the time." *Id.* at 32 ¶ 137. After Dr. G disputed the legality of the entry, Deputy Garza said something to the effect of, "I don't care what your lawyer says, we're coming in and we're taking these kids." *Id.* at 32 ¶ 139. Deputy Garza wore his sidearm throughout the confrontation, and he threatened Dr. G "with arrest or contempt for interfering with law enforcement." *Id.* at 32 ¶ 138. Over Dr. G's objection, Adame and Deputy Garza entered the home.

Inside, Adame announced and began implementing a safety plan,[14] which (1) required Mrs. Doe to leave Dr. G's house immediately "to ensure safety of the children"; (2) forbade Mrs. Doe from contacting the children through Dr. G and Mrs. G; (3) declared that "the children are currently in the custody of Kansas state, [sic] social services"; (4) advised Mrs. Doe that she must contact Gildner on May 7, 2009; and (5) advised Dr. G and Mrs. G that they must "follow through with" the safety plan as agreed.[15] *Id.* at 49. All three adults signed the plan. In the same discussion, Adame and Deputy Garza told Dr. G that Kansas officials would arrive later to take physical custody of the Doe children. Later, by phone, Adame prohibited Mr. Doe and the Doe children's grandparents from talking to the children. That evening, seeing the children's distress, Dr. G and his wife chose to drive through the night to

---

[14] To their First Amended Complaint, N.E.L. and M.M.A. attached the safety plan that Adame had implemented at Dr. and Mrs. G's home. Because they refer to the safety plan in their complaint and it's central to their claims, we consider it. *Gee*, 627 F.3d at 1186.

[15] The safety plan included a sixth requirement that is redacted or illegible as scanned into the filed joint appendix.

take the ten Doe children back to Kansas to turn them over to the state rather than wait for the Kansas officials to arrive.

## B. The Court Proceedings

Years later, on December 31, 2015, N.E.L. and M.M.A. filed a complaint in the United States District Court for the District of Colorado, naming Adame, Deputy Garza, Gildner, Abney, Webb, and Douglas County as defendants. Deputy Garza, Adame, and Douglas County moved to dismiss the complaint, and Gildner, Abney, and Webb later filed their own motion to dismiss. The magistrate judge recommended denying both motions after granting N.E.L. and M.M.A. leave to amend their complaint.

N.E.L. and M.M.A. then filed their First Amended Complaint, alleging under 42 U.S.C. § 1983 that Adame and Deputy Garza[16] had violated the Fourth Amendment by failing to register the Kansas ex parte order with a Colorado court before executing it, in violation of the Colorado UCCJEA; by entering Dr. and Mrs. G's home without a warrant; and by illegally seizing them. They also alleged that Adame, Deputy Garza, Gildner, Abney, and Webb had interfered with their right to familial association in violation of the Due Process Clause of the Fourteenth Amendment.

Based on these deprivations of their rights, N.E.L. and M.M.A. alleged that Adame, Deputy Garza, Gildner, Abney, and Webb had engaged in a civil conspiracy

---

[16] N.E.L. and M.M.A. also asserted this claim against Gildner, Abney, and Webb, presumably for precipitating Adame and Deputy Garza's actions.

to deprive them of their rights. And they alleged Douglas County's § 1983 liability for their Fourth Amendment injuries, based on two theories. First, they alleged that Douglas County had an "unwritten policy, custom[,] or practice" of seizing children "based on out-of-state ex parte court orders in violation of the United States Constitution and Colorado law, including but not limited to the Colorado [UCCJEA]." J.A. at 44 ¶ 216. Alternatively, they alleged Douglas County had acted with deliberate indifference in failing to adopt policies requiring compliance, or in failing to train personnel to comply, with "the United States Constitution and Colorado law, including but not limited to the Colorado UCCJEA." *Id.* at 44 ¶ 218.

Adame, Deputy Garza, and Douglas County moved to dismiss the First Amended Complaint, contending that the statute of limitations had run for N.E.L. and M.M.A.'s claims and, alternatively, that absolute, quasi-judicial, or qualified immunity barred the claims. They also contended that the First Amended Complaint insufficiently alleged Douglas County's liability on a custom or policy theory because it asserted only a single instance of unconstitutional conduct. Addressing N.E.L. and M.M.A.'s deliberate-indifference claim, they contended that the First Amended Complaint pleaded no supporting facts. In their motion, Adame and Deputy Garza acknowledged partly relying on a 2007 state-court standing order to enter Dr. and Mrs. G's home. The 2007 state-court standing order permitted law-enforcement and child-and-family-services personnel to interview alleged child-abuse victims "at a school, daycare, or other place where the child may be located," without a court order or signed consent from a parent or a guardian. *Id.* at 63.

12

Gildner, Abney, and Webb separately moved to dismiss the First Amended Complaint, alleging that the court lacked personal jurisdiction over them.

The magistrate judge recommended granting Adame, Deputy Garza, and Douglas County's motion to dismiss. He concluded that both prongs of the qualified-immunity analysis supported dismissing the Fourth Amendment claim against Adame and Deputy Garza, reasoning: (1) that N.E.L. and M.M.A. hadn't sufficiently alleged a constitutional violation, and (2) that they hadn't shown that Adame and Deputy Garza had violated clearly established law. Addressing the Fourteenth Amendment claim against Adame and Deputy Garza, he recommended granting the motion to dismiss on the first prong of the qualified-immunity analysis—that the plaintiffs had failed to allege a constitutional violation. He also recommended dismissing the civil-conspiracy claim after applying qualified immunity to defeat the underlying claims.

Having recommended dismissing N.E.L. and M.M.A.'s claims against Adame and Deputy Garza based on qualified immunity, the magistrate judge declined to address their statute-of-limitations affirmative defense. He next recommended dismissing N.E.L. and M.M.A.'s claim against Douglas County because he found no underlying constitutional violation. Addressing the claims against the Kansas defendants, Gildner, Webb, and Abney, he recommended transferring the claims to the United States District Court for the District of Kansas under 28 U.S.C. § 1631 in lieu of dismissing them for lack of personal jurisdiction.

N.E.L. and M.M.A. objected to the magistrate judge's recommendation on several fronts. To establish that he had incorrectly recommended dismissing Douglas

13

County from the case, N.E.L. and M.M.A. offered a 2012 Douglas County internal

policy as evidence of the county's deliberate indifference. That policy reads:

> Out-of-State Court Orders are <u>not</u> valid on their face in Colorado. When in contact with a citizen who wants an out-of-state court order enforced, inform them that you can not [sic] do that as their order has no legal standing in Colorado. Direct the person to the Douglas County District Court to obtain a Supplemental Colorado Court Order. Once that has been issued, the out-of-state order is considered 'domesticated' and the Sheriff's Office can enforce those provisions that are appropriate. (**This is not true, however, in the case of foreign Protection or Restraining Orders. Those are enforceable.** See PAT-D-201 – *Foreign Protection Orders*.)

*Id.* at 209.

But the district court was unpersuaded and adopted the magistrate judge's

recommendations. In so doing, the court granted Adame, Deputy Garza, and Douglas

County's Rule 12(b)(6) motion to dismiss on qualified-immunity grounds and

transferred N.E.L. and M.M.A.'s claims against Gildner, Webb, and Abney to the

District of Kansas.

## DISCUSSION

N.E.L. and M.M.A. appeal the district court's Rule 12(b)(6) dismissal of their

Fourth Amendment and Fourteenth Amendment claims against Adame and Deputy

Garza; the dismissal of their civil-conspiracy claim against Adame and Deputy

Garza; and the dismissal of their claim against Douglas County. N.E.L. and M.M.A.

don't appeal the district court's transfer of their claims against Gildner, Webb, and

Abney to the District of Kansas.

"The legal sufficiency of a complaint is a question of law," so we review de novo a district court's dismissal under Rule 12(b)(6). *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). In reviewing Rule 12(b)(6) dismissals, we accept the well-pleaded allegations of the complaint as true and view them in the light most favorable to the plaintiff. *Jones v. Hunt*, 410 F.3d 1221, 1223 (10th Cir. 2005). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff may not solely rely on "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Pleading facts "that are 'merely consistent with' a defendant's liability" doesn't meet that standard. *Id.* (quoting *Twombly*, 550 U.S. at 557).

We first address the qualified-immunity issue and then turn to N.E.L. and M.M.A.'s claim against Douglas County.[17]

---

[17] Because we conclude that Adame and Deputy Garza are entitled to qualified immunity, we don't reach their statute-of-limitations affirmative defense.

15

## A. Qualified Immunity

Qualified immunity protects government officials from liability for civil damages if their conduct "does not violate clearly established statutory or constitutional rights" that a reasonable person would have known about. *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).[18] "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Malley v Briggs*, 475 U.S. 335, 341 (1986)). To overcome a government official's qualified immunity defense, a plaintiff must demonstrate (1) that the official violated a statutory or constitutional right and (2) that the law clearly establishes that right. *Pyle v. Woods*, 874 F.3d 1257, 1262 (10th Cir. 2017). We may dispose of N.E.L. and M.M.A.'s claims on either prong. *See id.* at 1263. Here, we dispose of them on the second.

The law clearly establishes a right if "existing precedent . . . place[s] the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "The dispositive question is

---

[18] N.E.L. and M.M.A. assert that the district court incorrectly concluded that clearly established law is proved when the plaintiff proffers case law with closely analogous facts. They contend that the appropriate test for proving clearly established law is found in *Hope v Pelzer*, 536 U.S. 730, 739–40 (2002), which they argue requires plaintiffs to proffer case law that "only provide[s] 'fair warning' that an officer's conduct would violate the constitution." Appellants' Opening Br. at 25 (quoting *Hope*, 536 U.S. at 740). But as we have noted, *Hope v. Pelzer* appears to have fallen out of favor, yielding to a more robust qualified immunity. *See Aldaba v. Pickens*, 844 F.3d 870, 874 n.1 (10th Cir. 2016) (citing *Mullenix*, 136 S. Ct. at 308, 312 (2015)).

'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742). A case directly on point from the Supreme Court or our circuit clearly establishes a right. *See White*, 137 S. Ct. at 551. The clearly-established-law inquiry "must be undertaken in light of the specific context of the case," and isn't met by proving "a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). The proffered case law "must be 'particularized' to the facts" of the instant case. *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). And it's the plaintiff's burden to identify the relevant clearly established law. *Rios v. Riedel*, 456 F. App'x 720, 725 (10th Cir. 2012) (citing *Hilliard v. City & Cty. of Denver*, 930 F.2d 1516, 1518 (10th Cir. 1991)). We conclude that no law clearly establishes that Adame or Deputy Garza violated N.E.L. and M.M.A.'s Fourth Amendment and Fourteenth Amendment rights. We address each claim in turn.

### 1. Fourth Amendment

N.E.L. and M.M.A. argue that Adame and Deputy Garza failed to first register the ex parte Kansas order with a Colorado court as required by the Colorado UCCJEA, entered Dr. and Mrs. G's home without a warrant, and illegally seized them. Alternatively, N.E.L. and M.M.A. allege that Adame and Deputy Garza relied on the facially invalid Kansas ex parte order to enter the home. Each of these claims alleges a Fourth Amendment violation.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. But our inquiry is narrower than whether Adame and Deputy Garza violated the Fourth Amendment. We address only whether our precedent clearly establishes that they did.

For clearly established law, N.E.L. and M.M.A. point us to cases broadly discussing the Fourth Amendment warrant requirement and its exceptions,[19] and more helpfully, to two cases where social-services employees attempting to help abused children allegedly ran afoul of the Fourth Amendment.[20]

In *Roska v. Peterson*, 328 F.3d 1230, 1238, 1242 (10th Cir. 2003), we concluded that state employees violated the Fourth Amendment by entering a home without a warrant to remove a young boy suffering from Munchausen Syndrome by

---

[19]Appellants' Opening Br. at 16 (citing *Payton v. New York*, 445 U.S. 573, 586 (1980) (holding that warrantless entries into a home are presumptively unreasonable)); Appellants' Opening Br. at 22 (citing *United States v. Leon*, 468 U.S. 897, 926 (1984) (holding that evidence gathered as a result of a facially valid search warrant that is ultimately determined to lack probable cause shouldn't be suppressed)); Appellants' Opening Br. at 16 n.2 (citing *United States v. Rhiger*, 315 F.3d 1283, 1286 (10th Cir. 2003) (holding that social guests have Fourth Amendment expectations of privacy in others' homes)); Appellants' Opening Br. at 22, 28 (citing *United States v. Moland*, 996 F.2d 259, 261 (10th Cir. 1993) (stating that the *Leon* good-faith exception is inapplicable to an improperly executed warrant)).

[20] Appellants' Opening Br. at 24 (citing *Roska v. Peterson*, 328 F.3d 1230, 1238, 1242 (10th Cir. 2003)); Appellants' Opening Br. at 15 (citing *Jones*, 410 F.3d at 1224–25). *But see* Appellants' Opening Br. at 24 (citing *Gomes v. Wood*, 451 F.3d 1122, 1125–27 (10th Cir. 2006) (concerning Fourteenth Amendment claim brought under § 1983 by parents of child where social services had removed their child from their home after the child's pediatrician reported suspected child abuse)).

18

Proxy (MSBP) from his parents' custody. We stressed that the social workers "did not even attempt to obtain an ex parte order" before entering the Roskas' home without a warrant to take the boy, Rusty, into their custody. *Id.* at 1246. We determined that because "various doctors had suspected that Rusty was a victim of MSBP for quite some time, and the record indicate[d] that there was nothing particularly unusual about Rusty's condition at the time he was removed," "no evidence" existed that could have led "a reasonable state actor to conclude that there were exigent circumstances" permitting entry without a warrant. *Id.* at 1240–41.

Here, Adame and Deputy Garza did have an ex parte order when they entered Dr. and Mrs. G's home without a warrant and purported to place N.E.L., M.M.A., and the eight other Doe children in Kansas's custody. The social workers in *Roska* never even attempted to get such an order. 328 F.3d at 1246. So though *Roska* may be generally analogous to the present case, *see al-Kidd*, 563 U.S. at 742, it is far from "particularized" to the instant facts, *see White*, 137 S. Ct. at 552 (quoting *Anderson*, 483 U.S. at 640). In short, *Roska* doesn't clearly establish that Adame and Deputy Garza acted unreasonably.

In *Jones v. Hunt*, a woman sued a county sheriff and a social worker under § 1983 for illegally seizing her under the Fourth Amendment when she was sixteen. 410 F.3d at 1224–25. There, the county sheriff and social worker had met with her at school and told her that she couldn't live with her mother. *Id.* at 1224. They also informed her that contrary to a temporary protection order against her father, she had to live with him. *Id.* We found this seizure unreasonable under the Fourth

19

Amendment because the sheriff and social worker met the girl in "a small, confined school counselor's office"; the girl "knew that [the sheriff and social worker] had the authority to determine her custodial care"; the sheriff and social worker repeatedly threatened to "arrest her and follow her for at least the next two years, ensuring that her 'life would be hell'"; the meeting lasted "an 'hour or two'"; and she was "emotionally fragile and distraught" throughout the meeting. *Id.* at 1226.

Unlike the governmental employees in *Jones*, Adame and Deputy Garza purported to place N.E.L. and M.M.A. into Kansas's custody under the authority of an ex parte order. That order stated that an emergency threatened the safety of the Doe children, that "remaining in the home . . . would be contrary to the welfare of the child[ren]," and that child-in-need-of-care petitions had been filed alleging "physical, sexual, mental, or emotional abuse." J.A. at 47. The social worker and county sheriff in *Jones* acted contrary to a temporary protection order, not under the authority of one. 410 F.3d at 1224. So *Jones* doesn't clearly establish that Adame and Deputy Garza acted unreasonably.

Finally, N.E.L. and M.M.A. cite no authority concluding that failing to register an out-of-state ex parte order with a Colorado court before its execution constitutes a Fourth Amendment violation. No case they cite even mentions the Colorado UCCJEA or its registration requirement. Having failed to provide us authority clearly establishing that violating the Colorado UCCJEA is a Fourth Amendment violation, N.E.L. and M.M.A. haven't met their burden. So their Fourth Amendment claim fails on this theory, too.

20

## 2. Fourteenth Amendment

N.E.L. and M.M.A. next allege that Adame and Deputy Garza deprived them of their Fourteenth Amendment right to familial association by requiring Mrs. Doe to leave Dr. and Mrs. G's home; by prohibiting N.E.L. and M.M.A. from leaving with Mrs. Doe; by prohibiting N.E.L. and M.M.A. from traveling with Mrs. Doe, Mr. Doe, and their grandparents; and by detaining N.E.L. and M.M.A. for the purpose of terminating Mr. and Mrs. Doe's parental rights.

The Fourteenth Amendment's Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Under that provision, "[a] child has a constitutionally protected liberty interest in a relationship with her parent." *Lowery v. Cty. of Riley*, 522 F.3d 1086, 1092 (10th Cir. 2008). To state a claim for interference with familial association, a plaintiff must sufficiently allege that the government actor "inten[ded] to interfere with" the family relationship. *Trujillo v. Bd. of Cty Comm'rs*, 768 F.2d 1186, 1190 (10th Cir. 1985).

Here, N.E.L. and M.M.A. fail to provide us any authority clearly establishing their right to be free from state interference into their familial relationships on similar facts.[21] In so doing, they have failed to meet their burden. *Rios*, 456 F. App'x at 725

---

[21] N.E.L. and M.M.A. fail to cite in their opening brief any authority clearly establishing that Adame and Deputy Garza violated the Due Process Clause of the Fourteenth Amendment. *See* Appellants' Opening Br. at 28–32; Appellants' Reply Br. at 24–25; *see also* Appellees' Answer Br. at 38 (noting lack of cited authority). But they do cite to *Gomes*, 451 F.3d at 1128, a Fourteenth Amendment § 1983 case,

(citing *Hilliard v. City & Cty. of Denver*, 930 F.2d 1516, 1518 (10th Cir. 1991)). So they haven't shown that the law clearly establishes that Adame and Deputy Garza violated the Fourteenth Amendment's Due Process Clause.[22]

## B. Douglas County's Liability

N.E.L. and M.M.A. alleged that Douglas County (1) had a policy or custom of seizing children "based on out-of-state ex parte orders in violation of the United States Constitution and Colorado law, including but not limited to the Colorado [UCCJEA]," J.A. at 44 ¶ 216; or alternatively, (2) acted with deliberate indifference by failing to adopt a policy requiring its deputy sheriffs to comply, or in failing to

---

as clearly establishing their Fourth Amendment claim. *See* Appellants' Opening Br. at 24–25 (arguing that *Gomes* clearly establishes a parent's right to a prompt post-deprivation hearing and that, because Colorado didn't provide the Does such a hearing, Adame and Deputy Garza unreasonably seized N.E.L. and M.M.A. under the Fourth Amendment). Even if we were to consider *Gomes* as authority supporting N.E.L. and M.M.A.'s Fourteenth Amendment Due Process claim, it wouldn't help them. True, broadly, a parent has a right to a post-deprivation hearing under the Fourteenth Amendment. But that principle sheds no light on a child's placement into state custody under the authority of an ex parte order declaring the child in immediate danger. So *Gomes* isn't particularized to this case's facts and doesn't clearly establish that Adame and Deputy Garza violated the Fourteenth Amendment's Due Process Clause.

[22] Because Adame and Deputy Garza are entitled to qualified immunity against N.E.L. and M.M.A.'s Fourth Amendment and Fourteenth Amendment claims, they are also entitled to such qualified immunity against N.E.L. and M.M.A.'s civil-conspiracy claim based on the alleged violation of those same rights. *See Bisbee v. Bey*, 39 F.3d 1096, 1102 (10th Cir. 1994) (determining that civil-conspiracy claims under 42 U.S.C. § 1985(3) are subject to a qualified immunity defense); *see also Hale v. Townley*, 45 F.3d 914, 921 (5th Cir. 1995) (determining that a conspiracy claim wasn't actionable where officers in the case were "alleged to have violated [the plaintiff's] First Amendment rights" but were also "entitled to qualified immunity.").

train its officers to comply, with "the United States Constitution and Colorado law, including but not limited to the Colorado UCCJEA," *Id.* at 44 ¶ 218. And, they contend, this policy or custom, or this failure to adopt a policy or train its officers, led the county's personnel to violate the Fourth Amendment.

Under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690–91 (1978), counties can be liable under § 1983 even when their individual employees are shielded by qualified immunity. To state a viable *Monell* claim against a county, a plaintiff must sufficiently allege that the county has a "'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*, 436 U.S. at 694); *see also Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009) (reviewing a plaintiff's § 1983 claim against a county under Rule 12(b)(6)). But a county "may not be held liable under § 1983 solely because it employs a tortfeasor." *Brown*, 520 U.S. at 403.

A county policy or custom may take the form of "a formal regulation or policy statement" or an informal custom "amount[ing] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (alteration in original) (internal quotation marks omitted) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90 (10th Cir. 2010)). When the liability theory rests on a county's "failure to act," the plaintiff must show that the county's inaction was the result of "deliberate indifference." *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th

Cir. 1993) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). Typically, a "single incident" of unconstitutional behavior "is not sufficient to impose [municipal] liability." *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993).

N.E.L. and M.M.A. argue that Douglas County had either a formal policy or an unwritten custom that caused their injuries, or alternatively, that the county acted with deliberate indifference, which caused their injuries. We address all three theories in turn.

### 1. Formal Policy

N.E.L. and M.M.A. allege that, in 2009, Douglas County had a formal policy of complying with a 2007 state-court standing order that, they contend, leads Douglas County employees to violate the Fourth Amendment. But N.E.L. and M.M.A. didn't mention the standing order in their First Amended Complaint or even in their opening brief to this court. *See* J.A. at 44 ¶¶ 216–17; Appellants' Opening Br. at 34–35 (discussing only Douglas County's (1) informal custom or policy and (2) its deliberate indifference as the bases for its liability). N.E.L. and M.M.A. first raise this formal-policy theory of liability in their reply brief on appeal. *See* Appellants' Reply Br. at 1–2. So they have waived the argument. *United States v. Pickel*, 863 F.3d 1240, 1259 (10th Cir. 2017) (determining that when a party "makes [an] argument for the first time in his reply brief," it is waived.).

Even absent waiver, we would have concluded that N.E.L. and M.M.A. failed to sufficiently allege that the standing order caused their seizure in violation of the Fourth Amendment. The standing order doesn't authorize county officials to enter

homes without a warrant. So N.E.L. and M.M.A. haven't stated sufficient facts to sustain their formal-policy-based *Monell* claim.

## 2. Informal Custom

N.E.L. and M.M.A. allege that the 2012 Douglas County policy concerning the enforceability of out-of-state court orders and Deputy Garza's (or Adame's)[23] statement, "we do this all the time," evince a county custom that caused their illegal seizure. J.A. at 44 ¶ 216. For a § 1983 claim based on custom to withstand Rule 12(b)(6) dismissal, the plaintiff must sufficiently allege that the custom amounts to a widespread, permanent, and well-settled practice with the force of law. *Moss*, 602 F.3d at 1169 (quoting *Melton v. Okla. City*, 879 F.2d 706, 724 (10th Cir. 1989), *rev'd in part en banc on other grounds*, 928 F.2d 920, 932 (10th Cir. 1991)).

To support their argument of a county custom, N.E.L. and M.M.A. first point us to the Douglas County's 2012 policy concerning the enforceability of out-of-state ex parte orders. But N.E.L. and M.M.A. didn't attach this policy to their First Amended Complaint or even reference it by name. Instead, the First Amended Complaint refers vaguely to "Douglas County's discovery responses, including written policies produced in this litigation." J.A. at 44 ¶ 216. And N.E.L. and M.M.A. fail to allege facts plausibly showing that Douglas County followed this policy in 2009 (when the alleged illegal seizure occurred). *See Gee*, 627 F.3d at 1186 (permitting consideration of documents outside of the complaint under Rule 12(b)(6)

---

[23] It isn't clear from the First Amended Complaint whether Deputy Garza or Adame made this statement.

when (1) the complaint refers to the documents or incorporates them by reference or (2) the documents are undisputed, authentic, and central to the plaintiffs' claims, among other inapplicable exceptions). So because N.E.L. and M.M.A. didn't quote or reference this policy in their First Amended Complaint, and because it hasn't been sufficiently alleged as the county's authentic and undisputed policy in 2009, the policy fails to meet *Gee*'s exceptions. Thus, we don't consider it in our Rule 12(b)(6) analysis.

We see just one fact allegation in the First Amended Complaint that could possibly support their *Monell* county-custom claim—Deputy Garza's (or Adame's) statement, "we do this all the time." J.A. at 44 ¶ 216. But a single statement doesn't suffice to allege a continuing, persistent, and widespread county custom. So N.E.L. and M.M.A. haven't alleged sufficient facts to state a custom-based *Monell* claim against Douglas County.

### 3. Deliberate Indifference

N.E.L. and M.M.A. contend that Douglas County's failure to adopt a policy mandating compliance with, or its failure to train its deputy sheriffs to comply with, "the United States Constitution and Colorado law, including but not limited to the Colorado UCCJEA" amounted to deliberate indifference. *Id.* at 44 ¶ 218. Deliberate indifference may be shown "when the [county] has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Carr v.*

*Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003) (quoting *Barney v. Pulsipher*, 143 F.3d

1299, 1307 (10th Cir. 1998)).

The First Amended Complaint makes the following allegations related to

deliberate indifference:

> 190. Douglas County failed to adopt and/or implement any policy or policies prohibiting the unconstitutional seizure of children on the basis of out-of-state *ex parte* orders when such policy was needed to prevent predictable violations by Douglas County personnel.

> 191. The need for a policy or policies prohibiting the unconstitutional seizure of children on the basis of out-of-state *ex parte* orders was so obvious that Douglas County's failure to adopt and implement any such a policy is properly characterized as deliberate indifference.

> 192. Douglas County was deliberately indifferent to training its employees, including Adame and Garza, in protecting the Plaintiffs' procedural and substantive rights under the United States Constitution and the [Colorado UCCJEA] to be free from unlawful seizure without probable cause.

> 193. In the alternative, Douglas County acted with deliberate indifference in authorizing or in failing to adopt a policy or in failing to train personnel, including Garza and Adame, to ensure that the E*x Parte* orders to seize Plaintiff and his siblings were executed upon only after such orders were examined for facial validity as to probable cause.

> . . . .

> 218. In the alternative, prior to seizing Plaintiffs, Douglas County acted with deliberate indifference in failing to adopt a policy requiring Garza, or in failing to train personnel, including Garza, to comply with the United States Constitution and Colorado law, including but not limited to the Colorado UCCJEA

J.A. at 40 ¶¶ 189–93, 44 ¶ 218.

But none of these facts plausibly show that Douglas County's failing to adopt

a policy on, or in failing to train its officers on, the enforceability of out-of-state ex

parte orders "is substantially certain to result in" illegal seizures or entries into homes without warrants. *Carr*, 337 F.3d at 1229 (quoting *Barney*, 143 F.3d at 1307); *see also Shue v. Laramie Cty. Det. Ctr.*, 594 F. App'x 941, 946 (10th Cir. 2014) (affirming a Rule 12(b)(6) dismissal of a deliberate indifference claim where the complaint failed to aver that the municipality's failure to act was the "moving force" behind the plaintiff's constitutional injury). And even if we were to assume that the First Amended Complaint plausibly alleges a causal relationship between Douglas County's failure to act and the Fourth Amendment violations claimed here, the First Amended Complaint would still fail to state a claim under Rule 12(b)(6).

As written, the First Amended Complaint's allegations don't plausibly show that Douglas County had (1) "actual or constructive notice" that its failure to act would lead to illegal seizures or entries into homes without warrants, and (2) that the county "consciously or deliberately [chose] to disregard the risk of harm." *Carr*, 337 F.3d at 1229 (quoting *Barney*, 143 F.3d at 1307); *see Lewis v. McKinley Cty. Bd. of Cty. Comm'rs*, 425 F. App'x 723, 728 (10th Cir. 2011) (affirming a Rule 12(b)(6) dismissal where the complaint "lack[ed] sufficient allegations to meet the element of deliberate indifference"). N.E.L. and M.M.A.'s allegations at best show that it's a "sheer possibility" that Douglas County's failure to act led to N.E.L. and M.M.A.'s injuries, not that the county's liability is plausible. *Iqbal*, 556 U.S. at 678. So N.E.L. and M.M.A. have failed to allege sufficient facts to state a deliberate-indifference *Monell* claim against Douglas County.

## CONCLUSION

For the above reasons, we AFFIRM the district court.

Entered for the Court


Gregory A. Phillips
Circuit Judge

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**
**OFFICE OF THE CLERK**
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

| | | |
|---|---|---|
| Elisabeth A. Shumaker | July 03, 2018 | Chris Wolpert |
| Clerk of Court | | Chief Deputy Clerk |

Rebecca Messall
Messall Law Firm
7887 East Belleview Avenue, Suite 1100
Englewood, CO 80111

**RE:      17-1120, N.E.L., et al v. Douglas County, et al**
         Dist/Ag docket: 1:15-CV-02847-REB-CBS

Dear Counsel:

Enclosed is a copy of the order and judgment issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40, any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 6 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R.35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

*Elisabeth A. Shumaker*

Elisabeth A. Shumaker
Clerk of the Court

cc:     Anne Gepford Beville
        Kelly Dunnaway
        Dawn L. Johnson

EAS/na